

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

MATTHEW PRINCE,                                          08 CV 1829 (DRH)

                         Plaintiff,

           -against-

COUNTY OF NASSAU, "JOHN" FITZGERALD,
Lieutenant Nassau County Police Department, First
Precinct, "JOHN" SOTO, "JOHN" HERMAN,
ARNOLD ROTHENBERG, Sergeants, First
Precinct, SCOTT TUSA, Associate Fire Marshal,

                         Defendants.

------------------------------------------------------------------X


# PLAINTIFF'S LOCAL CIVIL RULE 56.1
# STATEMENT IN RESPONSE TO AND IN
# ADDITION TO THE DEFENDANTS' RULE
# 56.1 STATEMENT OF UNDISPUTED FACTS


HOGAN & CASSELL, LLP
Attorneys for Plaintiff
Michael D. Cassell
Shaun K. Hogan
500 North Broadway, Suite 153
Jericho, New York 11753
(516) 942-4700

Pursuant to Rule 56 of the Rules of this Court, the plaintiff, Matthew Prince ("Prince" or "Plaintiff"), by his attorneys, Hogan & Cassell, LLP, respectfully submits this Rule 56 Statement in opposition to the Rule 56 Statement filed by the defendants, County of Nassau, Brian Fitzgerald (s/h/a "John" Fitzgerald), Richard Soto (s/h/a "John" Soto), Richard Hermann (s/h/a "John" Herman), Arnold Rothenberg and Scott Tusa (collectively "Defendants").

## **FACTS IN SUPPORT OF PLAINTIFF'S OPPOSITION**

| DEFENDANTS' STATEMENT | PLAINTIFF'S RESPONSE | SUPPORT FOR RESPONSE |
|---|---|---|
| 1. Defendant County of Nassau ("the County") is a municipal corporation duly organized and existing pursuant to the laws of the State of New York. County Government Law of Nassau County, Laws 1936, Chapter 879; Nassau County Charter, Section 101. | Not disputed. | |
| 2. Defendant Scott Tusa ("Tusa") is employed by the Nassau County Office of the Fire Marshall and has been the Division Supervisor of the General Inspection Division since late 2004. | Not disputed. | |
| 3. Defendant Richard Soto ("Soto") is employed by the Nassau County Police Department and has been a Sergeant in the First Precinct since December 2005. | Not disputed. | |

| DEFENDANTS' STATEMENT | PLAINTIFF'S RESPONSE | SUPPORT FOR RESPONSE |
|---|---|---|
| 4.  Defendant Arnold Rothenberg ("Rothenberg") is employed by the Nassau County Police Department and has been a Sergeant in the First Precinct since January 2006. | Not disputed. | |
| 5.  Defendant Brian Fitzgerald ("Fitzgerald") is employed by the Nassau County Police Department and has been a Lieutenant Desk Officer in the First Precinct from December 2006 until July 2009. | Not disputed. | |
| 6.  Defendant Richard Hermann ("Hermann") is employed by the Nassau County Police Department and has been a Sergeant in the First Precinct Since January 2006. | Not disputed. | |
| 7.  From 1994 to January 2006, Matthew Prince ("Prince") regularly worked in various capacities as a bartender, deejay, manager, or consultant at Bogart's which was a bar and Restaurant. | Not disputed. | |
| 8.  From January 1, 2002 until October 21, 2002, the date of his parent's official complaint to the Nassau County Police Department ("NCPD") Internal Affairs Unit ("IAU"), seven appearance tickets and multiple New York State Liquor Authority ("SLA") referrals were issued to Prince for violations for underage | Disputed in part.  The documents referenced actually show six appearance tickets, not seven. | |

| DEFENDANTS' STATEMENT | PLAINTIFF'S RESPONSE | SUPPORT FOR RESPONSE |
|---|---|---|
| drinking, disorderly premises, unsupervised premises, and failure to post license. | | |
| 9. From October 22, 2002 until Bogart's closed in January 2006, four appearances tickets and multiple SLA referrals were issued to Prince for violations for underage drinking, overcrowding, disorderly premises, and failure to maintain exitways. | Disputed in part. While Prince does not dispute that between October 22, 2002 and January 2006, multiple SLA referrals were issued to him, the documents relied upon by Defendants demonstrate that more than four appearance tickets were issued to him. For example, Exhibit C to Ben-Sorek Dec. shows that Prince was issued appearance ticket numbers 214370, 216979, 010260, 010261, 010262, 010263, 010264, during the time period. In addition, Defendants' "proof" for this statement is solely based upon the number of appearance tickets that they produced. In light of the number of occasions that the police and fire marshals were at Bogart's it is unclear whether there were other tickets issued to Prince. Prince also disputes this statement to the extent that Defendants assert that the number of appearance tickets issued to Prince is indicative of the amount of harassment he faced. Such a correlation would be improper, especially since, for example, Sergeant Ronald Nesbitt ("Nesbitt") testified that there were times when he would park his police car in front of Bogart's and not keep any record of doing so. | See, e.g., Exhibit B to Declaration of Ben-Sorek ("Ben-Sorek Dec.") at Nassau County ("NC") 001157-001158; Exhibit J to Ben-Sorek Dec. at NC 000066-000068; deposition transcript of Ronald Nesbitt ("Nesbitt Tr.") at 49:21-53:16 (the Nesbitt Tr. is attached hereto as Exhibit 1. |
| 10. On September 26, 2003, Fire Marshall Krummenacker visited Bogart's for a safety inspection, and issued three appearance tickets to Prince News Corp. D/B/A Bogart's and two tickets to Prince. | Not disputed. | |
| 11. Krummenacker issued appearance tickets to Prince | Disputed in part. While Prince acknowledges that Krummenacker wrote | Deposition transcript of Michael |

| DEFENDANTS' STATEMENT | PLAINTIFF'S RESPONSE | SUPPORT FOR RESPONSE |
|---|---|---|
| for overcrowding and maintenance of exitways. | tickets to him, Krummenacker testified that his general procedure would be to write tickets to the corporation and "the manager, owner, agent in charge." Prince, however, testified that he was never the manager at Bogart's. Further, he was not the owner of Bogart's and whenever he was at Bogart's as a consultant, there was always a manager in charge. Despite a manager being in charge, the tickets would be written in Prince's name. | Krummenacker ("Krummenacker Tr.") at 119:10-120:1 (the Krummenacker Tr. is attached as Exhibit PPP to Ben-Sorek Dec.); deposition transcript of Matthew Prince ("Prince Tr.") at 53:14-16, 118:8-119:14 (the Prince Tr. is attached as Exhibits JJJ & WWW to Ben-Sorek Dec.). |
| 12. Krummenacker wrote the tickets to Prince "to ensure that there be proper representation of the corporation on the return of the summonses…, so if someone does fail to appear, there will be some means to issue a warrant for appearance." | Disputed in part. Prince does not dispute that Krummenacker so testified. Krummenacker should have never issued any tickets to Prince, however, since Prince was never the manager at Bogart's. Further, he was not the owner of Bogart's and whenever he was at Bogart's as a consultant, there was always a manager in charge. Despite a manager being in charge, the tickets would be written in Prince's name. Moreover, Sergeant Hermann testified that such tickets must be issued to the owner of the establishment and cannot be issued to a manager. | See response to statement number 11; deposition transcript of Richard Hermann ("Hermann Tr.") at 65:14-23 (the Hermann Tr. is attached as Exhibit MMM to Ben-Sorek Dec.). |
| 13. On September 15, 2005, Nassau County District Court Judge Pardes issued a bench warrant for Prince for failing to appear in response to the violations that occurred on September 26, 2003. | Not disputed. | |
| 14. From spring 2006 until March 2007, Prince helped build and design Chrebet's. | Not disputed. | |
| 15. From March 2007 until July 5, 2007, Prince served | Disputed in part. While Prince does not dispute the quoted terms of the March | Prince Tr. at 205:4-206:11. |

| DEFENDANTS' STATEMENT | PLAINTIFF'S RESPONSE | SUPPORT FOR RESPONSE |
|---|---|---|
| "as a General Manager of Chrebet's Bar and Restaurant and...[had] full control over the management and operation of Chrebet's." | 2007 consulting agreement, Prince testified that, in practice, Prince, along with two managers, Jen Shin and Christopher Green ("Green") had full control over Chrebet's. | |
| 16. On July 5, 2007, Chrebet "reached an agreement to compensate Matthew Prince in exchange for voiding [their] business agreement and severing [their] business relations. | Not disputed. | |
| 17. On October 6, 2002, Prince witnessed an altercation outside of Bogart's between Nassau County Police Department ("NCPD") officers and Peter Fama ("Fama"). | Not disputed. | |
| 18. At 1:55 AM, while Nesbitt, Collins and three other NCPD officers were ticketing cars in front of Bogart's, a fight erupted inside the bar resulting in two eighteen year old patrons being thrown out of the bar. | Not disputed. | |
| 19. The officers asked the patrons to leave, but the patrons refused and became physically and verbally abusive, including the assault of one of the officers. | Not disputed. | |
| 20. Prince was standing by the side door to Bogart's, did not see the initial contact between the NCPD and Fama, but saw three police officers assault Fama against a police | Not disputed. | |

| DEFENDANTS' STATEMENT | PLAINTIFF'S RESPONSE | SUPPORT FOR RESPONSE |
|---|---|---|
| car. | | |
| 21.  The officers arrested Fama for disorderly conduct, and issued a ticket to Prince for disorderly premises based on the fight inside the bar. | Disputed in part.  Fama was also charged with resisting arrest, unlawful possession of marijuana, obstruction of justice and assault. | See Case Report (attached hereto as Exhibit 2). |
| 22.  Prince testified that he was subpoenaed to testify, and did subsequently testify, before the Grand Jury about the Fama incident. | Not disputed. | |
| 23.  Prince's attorney told him that Fama was not indicted. | Not disputed. | |
| 24.  Of the three, Prince could only identify Officer Collins. | Disputed in part.  While Prince did testify that he only saw officer Collins, it is clear that Sergeant Nesbitt was also present since he completed the Licensed Premises Report and the Case Report states that Nesbitt was at the scene. | Exhibit I to Ben-Sorek Dec. at NC 000136; Case Report (attached hereto as Exhibit 2). |
| 25.  Prince testified at his deposition that Collins approached him the same day of testifying at the Grand Jury and said: "you didn't say anything about me, did you?" | Disputed in part.  As Prince explained, at the time that Collins made the quoted statement to Prince, Collins knew full well that Prince had testified against him at the grand jury because Collins then stated "I got the transcript.  I know every F-ing word you said and I'm going to take you out of your life for what you did." | Prince Tr. at 81:8-16. |
| 26.  Prince testified that he denied saying anything about Collins, but that Collins told him that "[He] got the transcript." | Not disputed. | |
| 27.  Prince testified that Collins told him that he got the transcript, that he knew every word Prince said, and | Not disputed. | |

| DEFENDANTS' STATEMENT | PLAINTIFF'S RESPONSE | SUPPORT FOR RESPONSE |
|---|---|---|
| that he was "going to take you out of your life." | | |
| 28. Prince testified that the police visits escalated after his Grand Jury testimony and "was all about Matt Prince" instead of just Bogart's. | Not disputed. | |
| 29. Collins never told Prince that he told, or was going to tell, any other officers of the Grand Jury testimony, and no one else ever said that to Prince. | Disputed. Prince testified that he believed that officer Collins told other officers about his Grand Jury testimony because officers treated him differently after his testimony. As Prince explained "Officers that liked me prior didn't like me post. . . prior to me testifying was strictly business by the police. They did whatever they had to do. After it was personal. That's the difference." | Prince Tr. at 98:5-99:7. |
| 30. All named defendants have testified that they either had no knowledge of Prince's Grand Jury testimony or the underlying assault upon which he testified. | Disputed. While Prince does not deny that some of the named defendants testified that they either had no knowledge of Prince's Grand Jury testimony or the underlying assault upon which Prince testified, Prince testified that it was obvious that the other officers were aware of his Grand Jury testimony because officers treated him differently after his testimony. As Prince explained "Officers that liked me prior didn't like me post. . . prior to me testifying was strictly business by the police. They did whatever they had to do. After it was personal. That's the difference." In addition, though Rothenberg testified that he never met Prince, he acknowledged that he has spoken to "numerous supervisors from the First Precinct" about Prince. Neither Soto nor Hermann testified as to whether or not he was aware that Prince had testified before the Grand Jury and thus, the portion of the Soto Tr. and Hermann Tr. relied upon by Defendants does not support their | Prince Tr. at 98:5-99:7; deposition transcript of Arnold Rothenberg ("Rothenberg Tr.") at 6:11-22 (the Rothenberg Tr. is attached as Exhibit NNN to Ben-Sorek Dec.); deposition transcript of Richard Soto ("Soto Tr.") at 88:18-89:9 (the Soto Tr. is attached as Exhibit LLL to Ben-Sorek Dec.); February 5, 2003 letter from Brian Griffin to Allan Prince (attached hereto as Exhibit 3). |

| DEFENDANTS' STATEMENT | PLAINTIFF'S RESPONSE | SUPPORT FOR RESPONSE |
|---|---|---|
|  | statement. Further, inasmuch as Grand Jury testimony is "secret," it is not surprising that none of the Defendants admitted to being aware of the testimony. Finally, Soto testified that as of the date of his deposition, June 2009, Collins was still a police officer in the First Precinct. |  |
| 31. On October 21, 2002, Allan and Pamela Prince filed a complaint of harassment with the Nassau County district Attorney and NCPD IAU. | Not disputed. |  |
| 32. Allan and Pamela Prince asked their attorney to file a complaint, regarding harassment by the NCPD, including that "several people have been subjected to excessive force and then wrongfully charged with Assault in the second degree." | Not disputed. |  |
| 33. Allan and Pamela Prince requested that employees and patrons provide statements to corroborate their complaint. | Disputed. Prince testified that he "believe[d]" that his parents requested the statements. He also testified that the employees did not know his parents that well and that the employees would not say whatever his parents wanted them to say. | Prince Tr. at 163:12-164:17. |
| 34. Prince testified that this "wasn't my lawsuit. It was my parents," and that he didn't "know their exact complaint…[or] exactly what they put in. I know I was there as a witness to my parents on stuff but it was my parent's case." | Prince does not dispute that he so testified, but, of note, is that a key component of his parents' complaint was the specific harassment suffered by Prince and the incident in which the police used excessive force on him. In addition, at the time, Prince was undeniably being harassed by the police. | Exhibit J to Ben-Sorek Dec. at NC 000003; Exhibit L to Ben-Sorek Dec. at NC 000162; Exhibit 3. |
| 35. They alleged harassment by members of the First | Disputed. Prince's parents alleged harassment that lacked a legitimate | Exhibit L to Ben-Sorek Dec. at NC 000162; |

| DEFENDANTS' STATEMENT | PLAINTIFF'S RESPONSE | SUPPORT FOR RESPONSE |
|---|---|---|
| Precinct in enforcement of the ABC laws and coercive behavior towards their patrons in enforcement of the parking regulations. | purpose. For example, the harassment included telling employees not to work at Bogart's; threatening to arrest underage people if they did not lie and say that they drank at Bogart's and threatening potential patrons not to go to Bogart's. | Prince Tr. at 123:9-127:13 |
| 36. On June 26, 2003, Hoffman interviewed residents near Bogart's in response to Allan and Pamela Prince's complaint of police harassment and was advised by the residents of constant incidents of parking problems, property damage, public urination, fights, disturbances, and drunk driving. | Disputed in part. Hoffman's report only contains interviews with three neighbors. Prince disputes that this is a proper sample size in which to determine whether or not the hundreds if not thousands of residents near Bogart's had similar complaints to the three interviewed neighbors. In addition, it appears that Hoffman only included the interviews of these three neighbors because they were negative towards Bogart's. | Exhibit J to Ben-Sorek Dec. at NC 000162. |
| 37. On February 24, 2004, the Nassau County District Attorney's Office reviewed the findings and progress on the IAU complaint by Pamela and Allan Prince. | Not disputed. | |
| 38. On January 11, 2005, the final disposition of Pamela and Allan Prince's complaint was entered as undetermined, unfounded, or exonerated. | Not disputed. | |
| 39. All named defendants have testified that they had no knowledge of any complaint by Prince and/or his parents to IAU regarding harassment. | Disputed. While Prince does not deny that some of the named defendants testified that they had no knowledge of any complaint by Prince and/or his parents to IAU regarding harassment, Rothenberg was never questioned about the issue and Tusa testified that he was well aware of complaints by Bogart's regarding police harassment since he attended a meeting regarding these issues. | Deposition transcript of Scott Tusa ("Tusa Tr.") at 97:2-99:4 (the Tusa Tr. is attached as Exhibit KKK to Ben-Sorek Dec.). |

| DEFENDANTS' STATEMENT | PLAINTIFF'S RESPONSE | SUPPORT FOR RESPONSE |
|---|---|---|
| 40. On September 12, 2007, Prince filed a Notice of Claim with the County of Nassau. | Not disputed. | |
| 41. Defendants never knew or heard of Prince's filling a notice of claim against the County, prior to being served with the Complaint. | Disputed in part. Prince does not dispute that named defendants Soto, Hermann and Tusa testified that they never knew or heard of Prince's filling a notice of claim against the County, prior to being served with the Complaint. Named defendants, Fitzgerald and Rothenberg, however, never testified as to this issue. | |
| 42. From 1994 to 2004, Bogart's operated as a licensed bar and restaurant, owned and operated by Prince's parents as principles. | Not disputed. | |
| 43. On the weekends, Bogart's was usually open until 4 A.M. | Disputed. Prince testified that Bogart's could be open until 4 A.M. on Saturday night, not that it would typically be open to 4 A.M. on weekends. | Prince Tr. at 35:3-17. |
| 44. The public occupancy at Bogart's was 270 patrons on the main level and 60 patrons on the lower level, for a total of 330 patrons. | Not disputed. | |
| 45. From April 2000 to May 2003, there were approximately 350 calls for police service and incidents at Bogart's, including conditions, aided cases, assaults and fights. | Disputed. Hoffman acknowledged that included within the 350 calls were car accidents that had absolutely nothing to do with Bogart's as well as "hang-ups," where people apparently called the police but did not report anything. Further, a review of the computer entries relied upon by Hoffman to calculate the 350 calls demonstrates that many of the entries are duplicative. For example, on December 8, 2002, there are three separate entries for "aided," which Hoffman testified signified an automobile accident where someone needed medical attention. Thus, the total | Deposition transcript of Ralph Hoffman ("Hoffman Tr.") at 113:8-117:2 (the Hoffman Tr. is attached hereto as Exhibit 4); Exhibit P to Ben-Sorek Dec. at NC 000067; deposition transcript of Timothy Marshall ("Marshall Tr.") at 7:22-8 (the Marshall Tr. is attached as Exhibit QQQ to Ben- |

| DEFENDANTS' STATEMENT | PLAINTIFF'S RESPONSE | SUPPORT FOR RESPONSE |
|---|---|---|
| | entries actually demonstrating an incident at Bogart's is far less than 350. In addition, Timothy Marshall, a fire communications technician, testified that there is no way to distinguish between a legitimate call and a prank call, without further investigation. Indeed, Fire Marshal Krummenacker acknowledged that in July 2005, the fire marshals were called to Bogart's for overcrowding, but the place was not overcrowded. The Fire Marshal's Log Sheet also indicates that they were called on July 31, 2005 and November 19, 2005 for overcrowding, but the location was not overcrowded. | Sorek Dec.); Krummenacker Tr. at 115:17-117:6; Exhibit Z to Ben-Sorek Dec. at NC 001113. |
| 46. From 1994 to October 2002, NCPD and the Fire Marshal issued seventy-five (75) appearance tickets, completed one case report, and made twelve arrests at Bogart's. | Disputed in part. Prince does not dispute that the document referenced by Defendants shows that from 1994 to October 2002, NCPD and the Fire Marshal issued approximately seventy appearance tickets, completed one case report, and made twelve arrests at Bogart's. | |
| 47. From November 2002 to June 2005, NCPD and the Fire Marshall issued fifty-six (56) appearance tickets, completed eight case reports, and made three arrests at Bogart's, who had their liquor license suspended twice during this time period. | Disputed in part. Prince does not dispute that the document referenced by Defendants shows that from November 2002 to June 2005, NCPD and the Fire Marshal issued approximately fifty appearance tickets, completed eight case reports, and made three arrests at Bogart's, which had its liquor license suspended twice during this time period. | |
| 48. On May 28, 2003, the SLA held a proceeding to suspend Prince News Corp. d/b/a Bogart's liquor license based upon the underage drinking violations against Prince that occurred on March 1, 2002. | Not disputed. | |
| 49. On June 23, 2003, Prince | Not disputed. | |

| DEFENDANTS' STATEMENT | PLAINTIFF'S RESPONSE | SUPPORT FOR RESPONSE |
|---|---|---|
| News Corp's liquor license was suspended by the SLA from June 23, 2003 to July 3, 2003, requiring the license to be surrendered to SLA. | | |
| 50.  On July 30, 2003, the SLA had a proceeding to suspend Prince News Corp d/b/a Bogart's Liquor license based on underage drinking violations from March 25, 2000, November 2, 2000, December 2, 2000, December 22, 2000, and over-served patron violations on March 24, 2000 and March 25, 2000. | Disputed in part.  The referenced document does not indicate that there was an underage drinking violation on December 2, 2000. | |
| 51.  The SLA suspended the liquor license from August 11, 2003 to August 21, 2003 and required Bogart's to surrender their liquor license. | Not disputed. | |
| 52.  Prince testified that his family surrendered the license because the cops were harassing Prince, because the police would only look for Prince and not for anyone else in charge where there was a problem at Bogart's, and his family had had enough. | Not disputed. | |
| 53.  On April 1, 2004, Pamela and Allen Prince, as representatives of Prince news Corp d/b/a Bogart's, surrendered their liquor license to the SLA. | Not disputed. | |
| 54.  In April 2004, Lisa and David Dobins ("Dobins"), under the name A-Leet | Not disputed. | |

| DEFENDANTS' STATEMENT | PLAINTIFF'S RESPONSE | SUPPORT FOR RESPONSE |
|---|---|---|
| Enterprises, became the new owners of Bogart's. | | |
| 55. The Dobins' applied for a new liquor license from the SLA, which was issued to A-Leet Enterprises d/b/a Bogart's. | Not disputed. | |
| 56. On March 11, 2005, Tusa and Deluca met with two attorneys from Bogart's who asked if Fire Marshals were harassing them by coming to Bogart's frequently, to which Tusa replied "we're there frequently because we're getting lot of complaints at the location...there's a lot of problems at the location." | Disputed. The fire marshals were very cold at the meeting and basically said that they could do what they wanted. Instead of trying to work with the Dobins, the fire marshals put fear into the Dobins. Tusa stated "this is the way it is, and if you think calling your attorney to call us is going to stop, think again." Moreover, the day after the meeting, the police and fire marshals performed a "routine inspection" of Bogart's. | Deposition transcript of Mark Deluca ("Deluca Tr.") at 125:19-126:8, 135:9-20 (the Deluca Tr. is attached hereto as Exhibit 5); Prince Tr. at 239:11-240:11. |
| 57. In October 2005, the liquor license held by A-Leet Enterprises d/b/a Bogart's, was suspended because Prince had been ticketed for violations of overcrowding and underage drinking. | Not disputed. | |
| 58. In December 2005 or January 2006, during the ABC lecture at NCPD Sergeants training, the instructor mentioned Bogart's as a problem locations in the First Precinct, based on a history of fights, underage drinking and assaults. | Not disputed. | |
| 59. Bogart's closed in January 2006. | Not disputed. | |
| 60. From March 2007 to August 2008, Wayne Chrebet | Not disputed. | |

| DEFENDANTS' STATEMENT | PLAINTIFF'S RESPONSE | SUPPORT FOR RESPONSE |
|---|---|---|
| opened and operated "Chrebet's" on the subject premises. | | |
| 61. In early 2006, Wayne Chrebet ("Chrebet") decided to open an upscale steak restaurant at the former Bogart's location. | Not disputed. | |
| 62. Chrebet "entered into a business agreement with Matthew Prince to serve as general manager of the bar-restaurant[,as] Mr. Prince was formerly employed by Bogart's for many years and possessed experience and expertise." | Not disputed. | |
| 63. Under the agreement, which did not specify a determined length of time for the agreement, Prince was to "serve as a General Manager of Chrebet's Bar and Restaurant and shall have full control over the management and operation of Chrebet's," wherein "every aspect of the business goes through [Prince]." | Disputed in part. While the agreement does contain the language quoted, Prince testified that the lease signed by Chrebet at the location was for twenty-five years. | Prince Tr. at 188:25-189:16. |
| 64. From spring 2006 until March 2007, Prince helped build and design Chrebet's, renovating it "to conform to the upscale nature of the restaurant and the type of patron [Chrebet] hoped to attract." | Not disputed. | |
| 65. Krummenacker did not know who the principals were | Disputed. Inasmuch as the only principal of Chrebet's was Wayne Chrebet, who | |

| DEFENDANTS' STATEMENT | PLAINTIFF'S RESPONSE | SUPPORT FOR RESPONSE |
|---|---|---|
| in Chrebet's, expect for Chrebet. | Krummenacker knew, Krummenacker did know all of the principals of Chrebet's. | |
| 66. On March 8, 2007, a forthwith order was "given to Matt Prince, General Manager" or consultant by the Fire Marshal's Office to conduct an emergency light test. | Not disputed. | |
| 67. In late March 2007, Chrebet opened up Chrebet's. | Not disputed. | |
| 68. On March 30, 2007, the Fire Marshal conducted a night safety inspection and observed no violations. | Not disputed. | |
| 69. On April 28, 2007, Officer Soto and two NCPD officers conducted a routine inspection of Chrebet's, observed no violations, and told Manager Jenny Shin and Head of Security Christopher Greene that the liquor and occupancy licenses, as well as other required signage, must be conspicuously posted on the wall so that NCPD and Fire Marshals could see them when they came in. | Disputed. Soto testified that the referenced inspection occurred at a time when Chrebet's was not open yet, and thus, it was not required to post any licenses. Further, Soto acknowledged that nowhere in the referenced premises report is there any reference to him making any observations regarding the postings of licenses and signs. In addition, Soto's recollection that the April 28, 2007 inspection occurred at a time that Chrebet's was not open is inconsistent with Chrebet's testimony that Chrebet's opened in late March 2007. | Soto Tr. at 120:11-121:5, 133:20-139:21; see also statement 67. |
| 70. On June 14, 2007, at 11:51 PM, Timothy Marshall, a communications technician at "Firecom," received an anonymous complaint that the first and second floors of Chrebet's were overcrowded and informed his direct supervisor, Robert Sutton. | Not disputed. | |

| DEFENDANTS' STATEMENT | PLAINTIFF'S RESPONSE | SUPPORT FOR RESPONSE |
|---|---|---|
| 71. At 11:58 PM, Sutton informed Fire Marshall Syzmanski of the overcrowding situation, who then informed Fire Marshall Tusa of the complaint. | Not disputed. | |
| 72. Fire Marshals Szymanski and Pilczak were already at Chrebet's when Tusa arrived. | Not disputed. | |
| 73. At 12:30 AM, Officer Soto responded to a call to assist the Fire Marshals at Chrebet's for an overcrowding situation and arrived after all of the Fire Marshals. | Not disputed. | |
| 74. Tusa asked Szymanski "what do you got, the place is jammed, can't get through the crowd, getting the manager out or the owner out or whatever." | Not disputed that Tusa so testified. | |
| 75. Tusa testified that "[t]here were a lot of young college student in there," and "whether the establishment was a college bar or steak house, it's still a public assembly that requires oversight and enforcement." | Disputed in part. The second quote was actually stated by Prince's attorney and agreed to by Tusa. This is not Tusa's actual testimony. | |
| 76. The Fire Marshals did not have enough people to cover all of the exits and do the count, so Soto and other officers were present to assist moving people from inside Chrebet's to outside. | Not disputed. | |
| 77. Before the count, | Disputed. While Prince does not dispute | Prince Tr. at 249:5- |

| DEFENDANTS' STATEMENT | PLAINTIFF'S RESPONSE | SUPPORT FOR RESPONSE |
|---|---|---|
| Syzmanski performed a quick five to ten minute walk through to make sure all exits were unlocked, and noticed a locked patio gate. | that Szymanski issued a ticket to Chrebet's for a locked patio gate, Prince disputes that the gate was actually locked. In fact, Chrebet demonstrated to the fire marshal that the gate was not locked. | 250:12; 50-h testimony of Wayne Chrebet ("Chrebet Tr.") at 20:7-24:11 (the Chrebet Tr. is attached hereto as Exhibit 6); January 23, 2008 Statement of Wayne Chrebet ("Chrebet Statement") ¶ 8 (the Chrebet Statement is attached hereto as Exhibit 7). |
| 78.  Tusa testified that the Fire Marshals usually asked for Fabrizio, "the schoolteacher," or Prince because "those are the names [they] knew associated with the place." | Not disputed. | |
| 79.  On the visit, Tusa asked Prince. | Not disputed. | |
| 80.  Tusa met Chrebet outside, prior to counting out the patrons, and told him that the place appeared to be "overcrowded," "we were going to count the place out," and "you don't have a door count." | Not disputed. | |
| 81.  Tusa told Chrebet to "turn up the lights, have the deejay stop the music and make an announcement for everybody to exit through the front door in an orderly fashion," and Chrebet complied. | Disputed in part.  While Prince does not dispute that Tusa so testified, Chrebet has affirmed that Tusa "ordered" that the lights be turned on and that Tusa "rudely ushered all of the patrons out of the restaurant." | September 4, 2008 affidavit of Wayne Chrebet ("Chrebet Aff.") ¶ 8 (Exhibit RRR to Ben-Sorek Dec.). |
| 82.  Tusa performed the clicker count, while | Not disputed. | |

| DEFENDANTS' STATEMENT | PLAINTIFF'S RESPONSE | SUPPORT FOR RESPONSE |
|---|---|---|
| Szymanski performed the stick figure count. | | |
| 83. The count lasted for approximately half an hour. | Disputed. Tusa testified that the count lasted "[p]robably more than a half hour." Prince testified that the court "took an extremely long time" and that the police and fire marshals "were making sure that this place had no shot of reopening that night." | Tusa Tr. at 148:14-17; Prince Tr. at 245:7-246:2. |
| 84. There were 573 patrons in Chrebet's, which had a maximum occupancy of 330 patrons. | Disputed. Chrebet has affirmed that the establishment was not overcrowded on the night of June 14, 2007 and he noted that he was prevented from verifying the head count. Prince also testified that there were less than 330 persons in Chrebet's. | Chrebet Aff. ¶ 8; Prince Tr. at 273:21-274:6. |
| 85. Syzmanski issued appearance tickets and forthwith orders to Chrebet's for an overcrowding violation and a locked patio gate. | Not disputed. | |
| 86. Between 1:00AM and 1:15AM, Tusa left Chrebet's after being there for approximately one hour. | Not disputed. | |
| 87. Soto went inside Chrebet's to perform a licensed premises check, and observed that the required signage for underage drinking and alcohol consumption by pregnant women were not posted appropriately, and that the liquor license and public assembly license were not properly displayed, but were located within a binder. | Disputed. As Prince explained, the original licenses were kept in a binder in the office to avoid them getting damaged. A copy of each of the required licenses was posted on the wall. Sergeant Hermann also acknowledged that Chrebet's properly displayed its licenses "in frames on the wall when you walk in the door." | Prince Tr. at 265:6-269:23; Hermann Tr. at 149:8-21. |
| 88. Soto did not issue any | Disputed in part. Prince acknowledges | See response to |

| DEFENDANTS' STATEMENT | PLAINTIFF'S RESPONSE | SUPPORT FOR RESPONSE |
|---|---|---|
| tickets for these violations, but gave a warning to Chrebet instead. | that Chrebet's did not receive a ticket, but denies that it committed any violations relating to the postings of licenses. In fact, Sergeant Hermann acknowledged that Chrebet's properly displayed its licenses "in frames on the wall when you walk in the door." | statement 87. |
| 89.  Soto explained to Chrebet that he was overcrowded and that he had previously explained to his manager Jenny Shin months ago that all five signs must be conspicuously posted so the[sic] that NCPD and Fire Marshals could see them when they came in. | Disputed in part.  While Prince does not dispute that Defendants' statement accurately reflects Soto's testimony, Soto's testimony is disputed because Prince and Chrebet testified that Chrebet's was not overcrowded.  In addition, Prince explained that the signs were properly displayed and Hermann acknowledged that the manner in which the licenses were displayed was not a basis to issue a summons. | See response to statements 84 and 87. |
| 90.  Soto left Chrebet's at 1:30 AM, and made no referrals to the SLA. | Not disputed. | |
| 91.  At 12:40 AM, on June 22, 2007, Soto was dispatched to Chrebet's in response to an anonymous 911 call about a fight at that location. | Disputed.  As Prince explained, when a person makes a 911 call, he/she typically waits for the police to arrive.  No one was waiting for the police to arrive on that date.  Further, the alleged 911 call states that there was a fight at Chrebet's involving 20-30 persons, inside and outside Chrebet's with weapons.  Soto admitted, however, that when he arrived at Chrebet's he did not see a fight in progress nor did he see any signs of a fight and none of the patrons that he spoke to said they had witnessed a fight.  Prince denied that there was any fight at Chrebet's that night and he never discussed a fight with Soto. | Prince Tr. at 262:2-7, 262:23-263:3, 263:11-17, 264:13-265:21, 273:17-19; Soto Tr. at 162:8-165:23, 207:12-211:25; June 22, 2007 call for service record at NC 02168 (attached hereto as Exhibit 8). |
| 92.  Soto did not see any signs of a fight outside and asked three employees | Disputed.  While Defendants' statement accurately reflects Soto's testimony, Soto's incident report states that upon | Exhibit LLL to Ben-Sorek Dec. at NC 000191. |

| DEFENDANTS' STATEMENT | PLAINTIFF'S RESPONSE | SUPPORT FOR RESPONSE |
|---|---|---|
| outside what was going on and who was in charge tonight, but the three employees did not respond. | arrival, he spoke with Glick and that when he asked Glick who was in charge, Glick said that Prince was in charge. The incident report does not make any reference to any employees who allegedly did not respond to Soto. | |
| 93.  Nassau County Police Officers entered Chrebet's and directed the employees to turn the lights on and turn the music off. | Not disputed. | |
| 94.  Soto asked the bartenders and other employees inside who was in charge and received no response. | Disputed.  While Defendants' statement accurately reflects Soto's testimony, Soto's incident report states that upon arrival, he spoke with Glick and that when he asked Glick who was in charge, Glick said that Prince was in charge. The incident report does not make any reference to any employees who allegedly did not respond to Soto. | Exhibit LLL to Ben-Sorek Dec. at NC 000191. |
| 95.  Fabrizio Glick told Soto that Prince was in charge. | Not disputed. | |
| 96.  Prince approached Soto and told him that he was not in charge and was just "a consultant for Wayne." | Disputed.  Prince testified that he told Soto "I'm in charge tonight."  In addition, Soto testified that Prince told him that "I am in charge." | Prince Tr. at 264:13-18; Soto Tr. at 173:19-23. |
| 97.  Soto asked about the fight inside Chrebet's, but Prince insisted the fight was outside. | Disputed.  Prince testified that he was not aware of any fight and he did not discuss a fight with Soto.  In addition, Soto's testimony that Prince insisted that the alleged fight was outside is not even consistent with his incident report, which states that Prince allegedly told him that the fight was inside of the bar. | Prince Tr. at 262:2-7, 263:11-17, 264:13-265:21, 273:17-19; Exhibit LLL to Ben-Sorek Dec. at NC 000191. |
| 98.  Soto asked Prince for the liquor license, public assembly license and Prince's identification. | Not disputed. | |

| DEFENDANTS' STATEMENT | PLAINTIFF'S RESPONSE | SUPPORT FOR RESPONSE |
|---|---|---|
| 99. Prince brought Soto the binder with the public assembly and liquor licenses in it, as neither license was properly displayed on the wall. | Disputed. As Prince explained, the original licenses were kept in a binder in the office to avoid them getting damaged. A copy of each of the required licenses was posted on the wall. Hermann acknowledged that the manner in which the licenses were displayed was not a basis to issue a summons. | Prince Tr. at 265:6-269:23; Hermann Tr. at 149:8-21. |
| 100. Soto went to his car to get his summons book to write up the violations and check Prince for any outstanding warrants through the car computer system, as he normally checks someone for outstanding warrants when he writes a summons. | Disputed in part. As Prince explained, Soto was clearly looking for a reason to further harass him. When he first met Soto, Soto stated "I'm going to be your new Sergeant Scalone." Soto then asked Prince for his driver's license for no apparent reason so that he could check his license. Soto returned from his vehicle and stated "Isn't today my lucky day? I get to arrest you." Soto's treatment of Prince was so improper that one of the officers who drove Prince to the police station personally apologized for Soto's conduct. | Prince Tr. at 264:13-273:19. |
| 101. Soto discovered an open bench warrant for Prince and told him that he was under arrest pursuant to that warrant, which was based on appearance tickets from September 26, 2003. | Disputed. Soto never informed Prince as to why he was being arrested. Instead, when Soto returned from his vehicle he stated "Isn't today my lucky day? I get to arrest you." Prince testified that Soto would not tell him why he was arrested and made sure that the other officers would not tell him why. Prince stated that he was never told by the NCPD that he had been arrested due to an open warrant. Soto's treatment of Prince was so improper that one of the officers who drove Prince to the police station personally apologized for Soto's conduct. | Prince Tr. at 264:13-277:14. |
| 102. Soto filled out the licensed premises report and informed Prince that a referral was being made to the SLA. | Disputed. The referenced incident report indicates that the owner, who is Chrebet, was notified of the referral, not Prince. Moreover, Prince testified as to what Soto said to him, which testimony did not | Exhibit MM to Ben-Sorek Dec. at NC 00083; Prince Tr. at 266:9-267:4. |

| DEFENDANTS' STATEMENT | PLAINTIFF'S RESPONSE | SUPPORT FOR RESPONSE |
|---|---|---|
| | include any mention of an SLA referral. | |
| 103.  Prince was issued appearance tickets for the failure to display underage drinking and birth defect signage, the improper posting of the licenses. | Not disputed. | |
| 104.  At 1:20 AM, Officer Sventoralis and Soto headed back to the First Precinct with Prince under arrest. | Disputed to the extent that it implies that Soto was in the same car as Prince.  Both Prince and Soto testified that Soto was not in the car with Prince. | Soto Tr. at 194:10-23; Prince Tr. at 270:10-271:20. |
| 105.  Hours later, Prince was arraigned in District Court and released. | Not disputed. | |
| 106.  From June 22, 2007 until Chrebet's closed, there were no complaints of overcrowding at Chrebet's. | Disputed in part.  Though Krummenacker did testify that he believed that there were no complaints of overcrowding at Chrebet's during this time period, it is significant that this would only confirm that the alleged "complaints" of overcrowding were directly related to Prince's presence at Chrebet's.  In fact, Chrebet testified that shortly after the June 22, 2007 raid he met with Krummenacker who told Chrebet that his problems would go away if he "got rid of" Prince, which Chrebet did.  Thus, this statement demonstrates that Chrebet's problems went away when Chrebet got rid of Prince as Krummenacker had told Chrebet. | Chrebet Tr. at 33:24-38:22, 44:25-45:19; Chrebet Aff. ¶¶ 10-14. |
| 107.  Fire Marshall Krummenacker knew Joseph Margiotta, Chrebet's attorney, for many years through personal relationships and business associates. | Not disputed. | |
| 108.  Krummenacker, in his individual capacity and at | Disputed.  Krummenacker actually testified that he thought that the meeting | Krummenacker Tr. at 75:25-76:15. |

| DEFENDANTS' STATEMENT | PLAINTIFF'S RESPONSE | SUPPORT FOR RESPONSE |
|---|---|---|
| Frank Antitomaso's request, attended a meeting at Chrebet's, in order to discuss some of the Fire Marshal's recent actions. | was "[i]n reference to his job" and about the "fire marshal's recent action." Thus, Krummenacker was not at the meeting solely in his individual capacity. | |
| 109.  One June 27, 2007, Krummenacker, Antitomaso, Margiotta, Chrebet, and a police officer had a lunch meeting at Chrebet's. | Disputed in part.  Prince testified and Chrebet has affirmed that the police officer was either a high ranking police officer or a County Police official. | Prince Tr. at 291:12-292:6; Chrebet Aff. ¶ 12. |
| 110.  Margiotta told Krummenacker that Chrebet was "concerned about the incidents that have taken place, and he would like to know what are some of the problems, and how can they be addressed to correct." | Not disputed. | |
| 111.  Krummenacker told Chrebet that his employees "must know the posted or allowable occupancy, [and] they must have a means of maintaining that occupancy without exceeding" it. | Disputed to the extent that this statement implies that Chrebet's was targeted because of improperly displayed signs. Rather, Krummenacker made it abundantly clear that Chrebet's was targeted because of Prince. As Chrebet testified: Q.  Do you recall what Mr. Krummenacker said? A.  He told me if I didn't get rid of Matt Prince, that these were the kind of problems, I was going to have. . . .     *    *    * Q.  Were these his exact words, if you didn't get rid of Mr. Prince, these are the kind of problems that would occur? A.  Yes. . . .     *    *    * A.      He said, if I don't get rid of Matt Prince, these are the problems you're going to have.     *    *    * Mr. Krummenacker said that Matt is a | Prince Tr. at 292:11-293:24; Chrebet Aff. ¶¶ 11-12; Chrebet Tr. at 35:20-37:23; Chrebet Statement ¶ 13. |

| DEFENDANTS' STATEMENT | PLAINTIFF'S RESPONSE | SUPPORT FOR RESPONSE |
|---|---|---|
|  | detriment or "cancer" to the business and [Chrebet's] problems would be over if he was gotten rid of or no longer associated with the business.<br>*   *   *<br>I was told that the only solution to my "problems" was to sever [my] relationship with Prince. |  |
| 112.  After Chrebet showed Krummenacker a binder containing the licenses, Krummenacker inform[ed] Chrebet that these should be conspicuously posted on the wall, as required by law. | Disputed to the extent that this statement implies that Chrebet's was targeted because of improperly displayed signs. Rather, Krummenacker made it abundantly clear that Chrebet's was targeted because of Prince.  As Chrebet testified:<br>Q.  Do you recall what Mr. Krummenacker said?<br>A.  He told me if I didn't get rid of Matt Prince, that these were the kind of problems, I was going to have. . . .<br>*   *   *<br>Q.  Were these his exact words, if you didn't get rid of Mr. Prince, these are the kind of problems that would occur?<br>A.  Yes. . . .<br>*   *   *<br>A.    He said, if I don't get rid of Matt Prince, these are the problems you're going to have.<br>*   *   *<br>Mr. Krummenacker said that Matt is a detriment or "cancer" to the business and [Chrebet's] problems would be over if he was gotten rid of or no longer associated with the business.<br>*   *   *<br>I was told that the only solution to my "problems" was to sever [my] relationship with Prince. | Prince Tr. at 292:11-293:24; Chrebet Aff. ¶¶ 11-12; Chrebet Tr. at 35:20-37:23; Chrebet Statement ¶ 13. |
| 113.  Krummenacker explained to Chrebet that when Fire Marshals come to | Disputed to the extent that this statement implies that Chrebet's was targeted because of lack of employee cooperation. | Prince Tr. at 292:11-293:24; Chrebet Aff. ¶¶ 11-12; Chrebet Tr. at |

| DEFENDANTS' STATEMENT | PLAINTIFF'S RESPONSE | SUPPORT FOR RESPONSE |
|---|---|---|
| an establishment, they expect the full cooperation from his employees, and "that if he did not comply with the basic items…that his problems would continue with law enforcement, the fire marshals." | In fact, Krummenacker acknowledged that he had no personal knowledge of lack of cooperation from Chrebet's employees. Moreover, Krummenacker made it abundantly clear that Chrebet's was targeted because of Prince. As Chrebet testified:<br>Q. Do you recall what Mr. Krummenacker said?<br>A. He told me if I didn't get rid of Matt Prince, that these were the kind of problems, I was going to have. . . .<br> *    *    *<br>Q. Were these his exact words, if you didn't get rid of Mr. Prince, these are the kind of problems that would occur?<br>A. Yes. . . .<br> *    *    *<br>A.   He said, if I don't get rid of Matt Prince, these are the problems you're going to have.<br> *    *    *<br>Mr. Krummenacker said that Matt is a detriment or "cancer" to the business and [Chrebet's] problems would be over if he was gotten rid of or no longer associated with the business.<br> *    *    *<br>I was told that the only solution to my "problems" was to sever [my] relationship with Prince. | 35:20-37:23; Chrebet Statement ¶ 13; Krummenacker Tr. at 85:15-20. |
| 114.  Near the end of the meeting, Margiotta told Chrebet that "it sounds like you have a problem with your manager here." | Disputed. Prince testified that Margiotta, after meeting with Krummenacker and Lowrey stated that "Consensus from both sides said your problem is Matt Prince, and if you don't terminate him, this is what you're going to deal with."  In addition, Chrebet testified that neither he nor Margiotta mentioned Prince's name as part of the problem prior to Krummenacker stating that he had to get rid of Prince. | Prince Tr. at 292:23-293:6; Chrebet Tr. at 37:24-38:6. |

| DEFENDANTS' STATEMENT | PLAINTIFF'S RESPONSE | SUPPORT FOR RESPONSE |
|---|---|---|
| 115. Chrebet commented that he had a manager in charge who he had a long personal relationship with and who he completely entrusted the operation of his business, but agreed "that he would try to talk to [Prince], and get a better understanding of what has to be done." | Disputed in part. Chrebet actually stated that he told everyone at the meeting that he would get rid of Prince because "that's what I would have to do." | Chrebet Tr. at 40:18-25; Prince Tr. at 293:13-21. |
| 116. Krummenacker never told Chrebet that he should change managers, fire Prince, or that things would be easier if there was a new manager. | Disputed. Krummenacker made it abundantly clear that Chrebet's was targeted because of Prince and that Chrebet's problems would go away if he fired Prince. As Chrebet testified:<br>Q. Do you recall what Mr. Krummenacker said?<br>A. He told me if I didn't get rid of Matt Prince, that these were the kind of problems, I was going to have. . . .<br>    *    *    *<br>Q. Were these his exact words, if you didn't get rid of Mr. Prince, these are the kind of problems that would occur?<br>A. Yes. . . .<br>    *    *    *<br>A.   He said, if I don't get rid of Matt Prince, these are the problems you're going to have.<br>    *    *    *<br>Mr. Krummenacker said that Matt is a detriment or "cancer" to the business and [Chrebet's] problems would be over if he was gotten rid of or no longer associated with the business.<br>    *    *    *<br>I was told that the only solution to my "problems" was to sever [my] relationship with Prince. | Prince Tr. at 292:11-293:24; Chrebet Aff. ¶¶ 11-12; Chrebet Tr. at 35:20-37:23; Chrebet Statement ¶ 13. |
| 117. On July 5, 2007, Chrebet "reached an agreement to compensate | Not disputed. | |

26

| DEFENDANTS' STATEMENT | PLAINTIFF'S RESPONSE | SUPPORT FOR RESPONSE |
|---|---|---|
| Matthew Prince in exchange for voiding [their] business agreement and serving [their] business relations." | | |
| 118. On November 9, 2007, at 2:51 AM, Hermann responded to a dispatch to Chrebet's for two patrons that claimed they were assaulted inside Chrebet's by the staff, with one of the patrons sustaining injuries. | Disputed in part. The two individuals who were allegedly assaulted were not patrons at the time of the alleged assault. Rather, they were two individuals who pushed their way into Chrebet's after closing, were told to leave, refused and were physically escorted out. Further, the alleged incident occurred outside of Chrebet's, not inside. | Hermann Tr. at 139:19-23; Exhibit TT to Ben-Sorek Dec. at NC 000201. |
| 119. Hermann spoke to the head of security, "Mike," inside of Chrebet's, who told him the two individuals came back after closing, pushed their way in, they were told to leave, they refused and were physically escorted out. | Not disputed. | |
| 120. Hermann repeatedly asked a group of ten employees "who's the manager" and "who's in charge?" to which he got no response. | Prince does not dispute that the statement accurately reflects Hermann's testimony. | |
| 121. Hermann repeated his question and said "If somebody doesn't tell me who's in charge here, then I'll be back tomorrow taking a zero tolerance policy. I'll be back with the fire marshal and the building inspector." | Disputed in part. Prince does not dispute that the statement accurately reflects Hermann's testimony. Hermann, however, decided to take a "zero tolerance policy," even though he was told who's in charge and returned the next day with the fire marshal and building inspector. | Exhibits VV, WW, YY to Ben-Sorek Dec. |
| 122. Greg Pravzo identified himself as the promotions manager and as being in charge, because the Manager | Disputed. Hermann testified that Jason did not identify himself as manager because he "was afraid," not because he refused to cooperate with police. | Hermann Tr. at 143:18-20; Exhibit VV to Ben-Sorek Dec. |

| DEFENDANTS' STATEMENT | PLAINTIFF'S RESPONSE | SUPPORT FOR RESPONSE |
|---|---|---|
| Jason "refused to cooperate with the police and claimed that he was not in charge." | | |
| 123. Hermann was taken upstairs to the office area by Chrebet's employees and shown a video of the incident, which looked like a big fight between the staff and two individuals. | Disputed in part. Prince does not dispute that the statement accurately reflects Hermann's testimony. Hermann's statement that the video showed "a big fight," however is not reflected in any of the police reports and the alleged video is not even referenced under the evidence section of the reports. Rather, the only evidence indicated in "Observation of Officers." | Exhibit TT to Ben-Sorek Dec. |
| 124. After viewing the video, Hermann went back downstairs, conducted a licensed premises check, and asked for the person in charge of the location, the liquor license, and the public assembly license. | Prince does not dispute that the statement accurately reflects Hermann's testimony. | |
| 125. The licenses were hanging on the wall. | Not disputed. | |
| 126. No tickets were issued, even though a disorderly premises violation had occurred based on the video of the fight. | Disputed in part. Prince does not dispute that no tickets were issued. Prince disputes that a disorderly premises. violation had occurred based on the video of the fight. As noted, the alleged video is not referenced in any of the police reports and the premises report does not reflect any violation. In addition, the evidence demonstrated that the alleged incident occurred outside of Chrebet's, not inside. | Exhibits SS, TT, UU to Ben-Sorek Dec. |
| 127. Hermann made a "referral...to the SLA for the actions of the security staff and the refusal of the manager to cooperate with the police." | Not disputed. | |



| DEFENDANTS' STATEMENT | PLAINTIFF'S RESPONSE | SUPPORT FOR RESPONSE |
|---|---|---|
| 128. Before leaving Chrebet's, Hermann made up his mind to return with the building inspector and Fire Marshal the next day, due to the staff's refusal to cooperate with him fully. | Disputed in part. Prince does not dispute that Hermann testified that he had made up his mind to return with the building inspector and Fire Marshal the next day. His "explanation," however, that the staff refused to cooperate with him, is belied by his acknowledgement that the promotions manager told him who was in charge and explained that the manager did not provide his name because he was "afraid," not because he was intentionally not cooperating with the police. | Hermann Tr. at 143:18-20, 151:15-152:11; Exhibit VV to Ben-Sorek Dec. |
| 129. On November 9, 2007 at 5:03 AM, Hermann sent an email to all supervisors in the first precinct, informing them that he was taking zero tolerance approach to Chrebet's based upon the refusal of the managers and staff to cooperate with him. | Prince does not dispute that the statement accurately reflects Hermann's email. Prince notes that Hermann acknowledged that it was not typical to send an email to all supervisors relating to a premises check. | Hermann Tr. at 184:4-19. |
| 130. On November 10, 2007, at approximately 1:18 AM, Hermann returned to Chrebet's, accompanied by two building inspectors, Fire Marshall's Tusa, Hartje, and Deluca, and at least four police officers. | Not disputed. | |
| 131. Hermann conducted a licensed premises check for both La Fame bar and Chrebet's with the fire marshal and building inspector that night. | Not disputed. | |
| 132. The group entered Chrebet's and asked for the manager, and Gregory Pravzo came forward and provided his name, personal | Disputed in part. The group asked for Matthew Prince by name, not just generally for the manager. | Chrebet Aff. ¶ 15; Chrebet Tr. at 49:19-50:11. |

| DEFENDANTS' STATEMENT | PLAINTIFF'S RESPONSE | SUPPORT FOR RESPONSE |
|---|---|---|
| information, and the liquor and public assembly licenses. | | |
| 133. Hermann ordered the music off and the lights up. | Not disputed. | |
| 134. Tusa and Hartje did not issue appearance tickets, but issued forthwith orders for: concealed sprinkler head caps; obstruction of sprinkler heads, draperies without fire resistance labels; maintain clear exits; and other required records to be faxed. | Not disputed. | |
| 135. The Building Department issued five tickets to Chrebet's. | Not disputed. | |
| 136. Herman[n] filled out a license[d] premises report, but issued no appearance tickets. | Not disputed. | |
| 137. On November 25, 2007, Deluca performed an emergency light test at Chrebet's, which passed inspection. | Not disputed. | |
| 138. On February 1, 2008, at approximately 11:27 PM, Hermann was dispatched to Chrebet's in response to an assault on a bartender, and issued an appearance ticket to the manager for the lack of a cabaret license. | Not disputed. | |
| 139. On February 24, 2008, at approximately 2:53 AM, Hermann responded to a dispatch to Chrebet's to assist | Disputed in part. The referenced testimony does not reflect that Hermann conducted a licenses premises check. In addition, the "disturbance" was, in | Chrebet Aff. ¶ 16. |

| DEFENDANTS' STATEMENT | PLAINTIFF'S RESPONSE | SUPPORT FOR RESPONSE |
|---|---|---|
| an officer with a disturbance in front of Chrebet's, conducted a licensed premises report and found no violations. | actuality, Hermann detaining a male African-American patron who was attempting to leave the parking lot. Sergeant Hermann cautioned Chrebet's about admitting a "Black crowd" and he promised to return. | |
| 140.  On March 3, 2008 Hermann informed Inspector Capece via e-mail that he was going to organize a bar detail, involving the NCPD, Fire Marshalls, building inspector, and SLA for licensed premise checks for Chrebet's, Roti restaurant, Golden Crest, and Cahoots. | Not disputed. | |
| 141.  Hermann chose to check Chrebet's because "Mike," a person running the security at Chrebet's, informed him that Prince was now running the place and was using a certain promoter that had been trouble in the past. | Disputed in part.  The timing of Hermann's email corroborates the reality that the focus of the raid was on Prince, because Hermann testified that he sent the email almost immediately after hearing that Prince was running Chrebet's. Hermann also testified that he had intended on "inspecting" Chrebet's even if the alleged problem promoter was not there, thus demonstrating that the true reason for "inspecting" Chrebet's was Prince and not the promoter. | Hermann Tr. at 98:2-105:19. |
| 142.  On March 8, 2008, at approximately 12:20 AM, Officers Rothenberg and Hermann, accompanied by seven other NCPD Officers, Fire Marshalls Deluca, Uttaro, and Syzmanski, two building inspectors, and one SLA representative entered Chrebet's. | Not disputed. | |
| 143.  Hermann went to Chrebet's because Chrebet's | Disputed.  As noted above, Hermann testified that he had intended on | Hermann Tr. at 105:13-19; Chrebet Aff. ¶ 17; |

| DEFENDANTS' STATEMENT | PLAINTIFF'S RESPONSE | SUPPORT FOR RESPONSE |
|---|---|---|
| was becoming a problem, and he had information that they were using a promoter that had a history of major problems. | "inspecting" Chrebet's even if the alleged problem promoter was not there, thus demonstrating that the true reason for "inspecting" Chrebet's was Prince and not the promoter. In addition, as Chrebet has affirmed, as soon as Hermann entered Chrebet's he announced that he was looking for Prince. When Hermann was told that Prince was not present, in disbelief, Hermann proceeded, without permission, to search the upstairs office for Prince. After failing to locate Prince, Hermann inquired if Prince was still at Chrebet's. Hermann stated that Prince would be arrested if he was found at the premises. As Chrebet testified, Hermann came to Chrebet's because he was "looking for [Prince]." Prince likewise testified about the police raiding Chrebet's looking for him. | Chrebet Tr. at 55:12-58:7; Prince Tr. at 300:22-302:13. |
| 144. Hermann directed Chrebet's to turn the house lights on and the music off. | Not disputed. | |
| 145. Hermann asked to speak to the manager and Max Feinberg and Chris Greene came over to speak with him. | Disputed in part. Prince does not dispute that the statement accurately reflects Hermann's testimony. As Chrebet has affirmed, however, as soon as Hermann entered Chrebet's he announced that he was looking for Prince. When Hermann was told that Prince was not present, in disbelief, Hermann proceeded, without permission, to search the upstairs office for Prince. After failing to locate Prince, Hermann inquired if Prince was still at Chrebet's. Hermann stated that Prince would be arrested if he was found at the premises. As Chrebet testified, Hermann came to Chrebet's because he was "looking for [Prince]." | Chrebet Aff. ¶ 17; Chrebet Tr. at 55:12-58:7. |
| 146. Hermann asked Feinberg and Chris if they | Prince does not dispute that the statement accurately reflects Hermann's testimony. | |

| DEFENDANTS' STATEMENT | PLAINTIFF'S RESPONSE | SUPPORT FOR RESPONSE |
|---|---|---|
| were using the promoter from Rapture this Friday night, which they denied. | | |
| 147. Feinberg and Green told Hermann and the SLA investigator, Howard Rosen, "that they were running a restaurant and not a nightclub." | Prince does not dispute that the statement accurately reflects Hermann's testimony. | |
| 148. Hermann inspected the liquor license, the public assembly license, and the entire premises for illegal activity, including the first floor bar, the main floor, and the second floor. | Disputed. As Chrebet explained, Hermann's "reason" for searching Chrebet's was because he was looking for Prince. In addition, there was no basis for Hermann to inspect Chrebet's to analyze the liquor licenses since he acknowledged that the licenses "were in frames on the wall when you walk through in the door." Moreover, Hermann admitted that while he was on the second floor he specifically asked for Prince, which belies his explanation that he was inspecting the entire premises to see if there was any illegal activity. | Chrebet Aff. ¶ 17; Chrebet Tr. at 55:12-58:7; Hermann Tr. at 149:8-21, 235:13-236:3. |
| 149. While on the second floor, Hermann asked a female employee whether Prince was working that night. | Not disputed. | |
| 150. The female employee replied that Prince wasn't here. | Not disputed. | |
| 151. Hermann asked for Prince, because he was looking for the manager and was told by Mike, the head of security, that Prince was the manager. | Disputed in part. Prince does not dispute that Hermann asked the female employee for Prince. Hermann, however, had already acknowledged that when he entered the establishment he spoke with the manager, Max Feinberg and Chris Greene. Thus, his statement that he asked for Prince because he was looking for the | Hermann Tr. at 225:19-226:13; Chrebet Aff. ¶ 17. |

| DEFENDANTS' STATEMENT | PLAINTIFF'S RESPONSE | SUPPORT FOR RESPONSE |
|---|---|---|
| | manager is clearly just a pretext. Finally, it is inconceivable that in March 2008, Chrebet's head of security would state that Prince, who had been terminated in July 2007, was the manager of Chrebet's. | |
| 152. SLA made no findings and issued no tickets on that visit. | Not disputed. | |
| 153. The Fire Marshal issued a forthwith order the servicing of the automatic fire extinguisher system. | Not disputed. | |
| 154. The building inspector issued a ticket for obstructed exit. | Not disputed. | |
| 155. On March 14, 2008, Hermann and seven other Nassau County Police Officers ticketed parked cars on Belmont Place, Meadowbrook Place and Huntington Place, which are streets next to and south of Chrebet's. | Not disputed. | |
| 156. Hermann ticketed ten (10) cars that were illegally parked in violation of the posted signs. | Prince does not dispute that the referenced exhibit demonstrates that Hermann issued ten tickets for cars that were allegedly illegally parked. | |
| 157. On March 17, 2008, Wayne Chrebet Sr. and Chrebet's business consultant, Christopher Greene, had a meeting with Fitzgerald and Rothenberg. | Not disputed. | |
| 158. The unscheduled meeting took place at the First Precinct at Chrebet Sr.'s | Not disputed. | |

| DEFENDANTS' STATEMENT | PLAINTIFF'S RESPONSE | SUPPORT FOR RESPONSE |
|---|---|---|
| request. | | |
| 159. Chrebet Sr. was concerned about the parking enforcement around Chrebet's and wanted the police to overlook parking violations at Chrebet's. | Disputed. Chrebet Sr. requested the meeting in an effort to stop the improper harassment of Chrebet's and its patrons. In addition, Rothenberg testified that Chrebet Sr. stated that he was concerned about the frequency that the police "visited" Chrebet's and he wanted to know if there was a problem. Rothenberg never mentioned that there was any discussion of parking violations during the meeting. In addition, Defendants' assertion that Chrebet Sr. wanted the police to overlook parking violations at Chrebet's is not true and was never discussed. | December 10, 2010 Affidavit of Wayne Chrebet, Sr. ("Chrebet Sr. Aff.") ¶ 11 (the Chrebet Sr. Aff. is attached hereto as Exhibit 9); Chrebet Aff. ¶ 19; Rothenberg Tr. at 69:15-82:6. |
| 160. Fitzgerald explained that "he would contact the Town of Hempstead and ask them for the assistance, because that wasn't the purview of the police department." | Disputed. As noted above, Chrebet Sr. did not request the meeting to discuss parking problems. Thus, there would not have been any occasion for the alleged conversation to occur. In fact, Chrebet Sr. has affirmed that this statement was never made. | See response to statement 159; Chrebet Sr. Aff. ¶ 12. |
| 161. Chrebet Sr. then wanted to talk about the level of enforcement at Chrebet's. | Not disputed to the extent that "enforcement" is synonymous with harassment. | Chrebet Sr. Aff. ¶ 11; Chrebet Aff. ¶ 19. |
| 162. The meeting lasted approximately 30 minutes. | Disputed in part. The meeting lasted approximately twenty (20) minutes. | Chrebet Sr. Aff. ¶ 8. |
| 163. Chrebet Sr. was concerned that the police had frequently visited Chrebet's, wanted to know if there was a problem, and what can be done to take care of those problems. | Not disputed. | |
| 164. Rothenberg replied that "our goal, like with every other establishment, is to have a prosperous, law abiding, | Disputed. In reality, Rothenberg told Chrebet Sr. that if he wanted the harassment to cease, he would need to write a letter to Prince advising Prince | Chrebet Aff. ¶ 19; Chrebet Sr. Aff. ¶ 13; Chrebet Tr. at 61:23-62:2; Prince Tr. at |

| DEFENDANTS' STATEMENT | PLAINTIFF'S RESPONSE | SUPPORT FOR RESPONSE |
|---|---|---|
| thriving business, and. . . the one thing nobody wants is we don't want a closed business. . . [and that] his license was for a restaurant." | never to attend Chrebet's and stating that he would be arrested for trespass if he did. | 303:2-25; Exhibit VVV to Ben-Sorek Dec. |
| 165.  Chrebet Sr. asked if there were any issues with Prince, to which Rothenberg responded "that the previous establishment, Bogart's, had had a lot of issues prior to it becoming Chrebet's," including underage drinking, DWI arrests, and "a constant source of trouble to the precinct." | Disputed.  In reality, Rothenberg told Chrebet Sr. that if he wanted the harassment to cease, he would need to write a letter to Prince advising Prince never to attend Chrebet's and stating that he would be arrested for trespass if he did.  In addition, Chrebet Sr. has affirmed that it was Rothenberg who first mentioned Prince's name.  Moreover, Rothenberg's assertion that Chrebet Sr. brought up Prince's name completely out of the blue is belied by the fact that Prince had no affiliation with Chrebet's for the prior eight months (i.e. July 5, 2007-March 12, 2008), defies credibility. | Chrebet Aff. ¶ 19; Chrebet Sr. Aff. ¶¶ 13-14; Chrebet Tr. at 61:23-62:2; Prince Tr. at 299:18-303:25; Rothenberg Tr. at 75:21-76:6; Exhibit VVV to Ben-Sorek Dec. |
| 166.  Chrebet Sr. were the first persons to bring up Prince, and told Rothenberg that Prince "is not involved in the business...that they are not Bogart's, they have nothing to do with Bogart's, [and] that Matt Prince has nothing to do with their business." | Disputed.  In reality, Rothenberg told Chrebet Sr. that if he wanted the harassment to cease, he would need to write a letter to Prince advising Prince never to attend Chrebet's and stating that he would be arrested for trespass if he did.  In addition, Chrebet Sr. has affirmed that it was Rothenberg who first mentioned Prince's name.  Moreover, Rothenberg's assertion that Chrebet Sr. brought up Prince's name completely out of the blue is belied by the fact that Prince had no affiliation with Chrebet's for the prior eight months (i.e. July 5, 2007-March 12, 2008), defies credibility. | Chrebet Aff. ¶ 19; Chrebet Sr. Aff. ¶¶ 13-14; Chrebet Tr. at 61:23-62:2; Prince Tr. at 299:18-303:25; Rothenberg Tr. at 75:21-76:6; Exhibit VVV to Ben-Sorek Dec. |
| 167.  Chrebet Sr. was concerned because "he had heard...that Matt Prince's name had been mentioned and that it was somehow an issue." | Not disputed. | |

36

| DEFENDANTS' STATEMENT | PLAINTIFF'S RESPONSE | SUPPORT FOR RESPONSE |
|---|---|---|
| 168.  Chrebet Sr. said that Chrebet's was being targeted because the police mistakenly believed that Prince was involved with the business. | Not disputed. | |
| 169.  Chrebet Sr. tells Rothenberg that Prince has nothing to do with the business and Chrebet's didn't want him there, and asks "what can we do to make sure that he's not there." | Disputed.  At the time of the meeting, Prince had already severed ties with Chrebet's and had not been at the establishment for several months prior.  Thus, Chrebet's did not need police assistance to keep Prince away from Chrebet's.  Moreover, at the time, Chrebet Sr. had a good relationship with Prince and there was no need for him to ensure that Prince was not at Chrebet's.  Further, in light of the harassment that Chrebet's had incurred at the hands of the police and others, the last people that Chrebet Sr. would seek assistance from to allegedly keep Prince away from Chrebet's was the police.  Moreover, Rothenberg's assertion that Chrebet Sr. raised a concern about keeping Prince away from Chrebet's defies credibility inasmuch as Chrebet's had cut ties with Prince in July 2007 and Prince testified that after July 2007, he was only at Chrebet's one time, which was in August 2007. | Prince Tr. at 299:18-304:6; Chrebet Aff. ¶ 19; Chrebet Sr. Aff. ¶ 15; Chrebet Tr. at 61:23-62:2; Exhibit VVV to Ben-Sorek Dec. |
| 170.  Rothenberg says "if you don't want him there, you have to communicate that fact to him and that if he is present there after you've communicated that fact to us and you call us, then he can be arrested for trespassing." | Disputed.  As explained in response to statement 169, Chrebet Sr. did not have any concerns about Prince being at Chrebet's and he never stated that he did not want him at Chrebet's.  Rather, Rothenberg told Chrebet Sr. that if he wanted the harassment to cease, he would need to write a letter to Prince advising Prince never to attend Chrebet's and stating that he would be arrested for trespass if he did.  Fitzgerald and Rothenberg made it clear to Chrebet Sr. that Chrebet's would continue having problems with the police unless he | Prince Tr. at 299:18-304:6; Chrebet Aff. ¶ 19; Chrebet Sr. Aff. ¶ 16; Chrebet Tr. at 61:23-62:2; Exhibit VVV to Ben-Sorek Dec. |

37

| DEFENDANTS' STATEMENT | PLAINTIFF'S RESPONSE | SUPPORT FOR RESPONSE |
|---|---|---|
| | prepared and sent such a letter to Matthew Prince. | |
| 171. Rothenberg never told Chrebet Sr. to prepare a letter for Prince or tell anyone to end a relationship with [P]rince. | Disputed. Rothenberg told Chrebet Sr. that if he wanted the harassment to cease, he would need to write a letter to Prince advising Prince never to attend Chrebet's and stating that he would be arrested for trespass if he did. The day before sending the letter, Chrebet Sr. even called Prince and told him "I went to the police with Chris Green and the police basically said, 'If we hear Matt Prince is still helping your place, we're going to constantly raid your place until we know for sure Matt's not.'" And Chrebet Sr. said "Matt Prince has nothing to do with this place. He's been terminated since July '07." The police told Chrebet Sr. that he better make it very clear to Prince that he better not step foot in Chrebet's again. Chrebet Sr. then said "I'm sending you a certified letter [Exhibit VVV to Ben-Sorek Dec.] that I'm CC'ing back to the police to let them know I did as they asked." Chrebet Sr. apologized for having to send the letter. | Prince Tr. at 299:18-304:6; Chrebet Aff. ¶ 19; Chrebet Sr. Aff. ¶ 17; Chrebet Tr. at 61:23-62:2; Exhibit VVV to Ben-Sorek Dec. |
| 172. On March 19, 2008, Chrebet sent Prince a letter informing him that he could no longer come onto the premises. | Not disputed. | |
| 173. Fitzgerald remembers reading the sentence "due to the position of the authorities, we have no alternative, and...telling Mr. Chrebet [Sr.], it's not our position, it's his position if he doesn't want Matt Prince to work for him." | Disputed. Chrebet Sr. never met with Fitzgerald after he sent the March 19, 2008 letter. Further, Fitzgerald's statement is belied by the fact that the police specifically instructed Chrebet Sr. to write the letter to Prince. | Chrebet Sr. Aff. ¶¶ 7, 1, 18. |
| 174. On June 3, 2008, the | Disputed in part. The statement fails to | Chrebet Aff. ¶ 20. |

38

| DEFENDANTS' STATEMENT | PLAINTIFF'S RESPONSE | SUPPORT FOR RESPONSE |
|---|---|---|
| NCPD were called by an employee of Chrebet's to assist with an "unruly patron," to which Hermann responded, but wrote no tickets. | mention that Hermann harassed Chrebet's employees regarding the sound system and permits. | |
| 175. On July 3, 2008, Rothenberg, Soto, and other NCPD officers requested identification from Chrebet's patrons that were sitting on the side patio. | Not disputed. | |
| 176. Soto had information that the sidewalk on Meadowbrook place was being blocked by an outdoor patio that had been built out from Chrebet's. | Prince does not dispute that the statement accurately reflects Rothenberg's testimony. | |
| 177. Rothenberg, Soto, and other officers entered Chrebet's and ordered the lights and the music off. | Not disputed. | |
| 178. Rothenberg, Soto, and other officers blocked the exits and asked for identification from all the patrons. | Not disputed. | |
| 179. From May 2008 to August 2008, there have been no dispatches of the NCPD or fire marshal's to Chrebet's. | Disputed. The NCPD went to Chrebet's on June 3, 2008 and July 3, 2008. | Chrebet Aff. ¶¶ 20-21. |
| 180. Chrebet's closed in August 2008. | Not disputed. | |

39