UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
MATTHEW PRINCE,

                           Plaintiff,                       **<u>MEMORANDUM & ORDER</u>**

    -against-                                   08 CV 1829 (DRH) (AKT)

COUNTY OF NASSAU, JOHN FITZGERALD,
Lieutenant, Nassau County Police Department,
1st Precinct, JOHN/JANE DOES #1-5 Police
Supervisory and Training Personnel, JOHN
SOTO, JOHN HERMAN, ARNOLD
ROTHENBERG, Sergeants, 1st Precinct, JOHN/
JANE DOES #6-20, Police Officers, SCOTT
TUSA, Associate Fire Marshal, Nassau County
Office of Fire Marshal, JOHN/JANE DOES
#21-25, Fire Marshal Supervisory and Training
Personnel, and JOHN/JANE DOES #26-30,
Associate Fire Marshals,

                            Defendants.
----------------------------------------------------------X
**APPEARANCES:**

**HOGAN & CASSELL, LLP**
Attorneys for Plaintiff
500 North Broadway
Suite 153
Jericho, New York 11753
By:   Michael D. Cassell, Esq.
       Shaun K. Hogan, Esq.

**OFFICE OF THE NASSAU COUNTY ATTORNEY**
Attorneys for Defendants
John Ciampoli
Nassau County Attorney
One West Street
Mineola, New York 11501
By:   Erica Michelle Haber, Esq.
       Liora Ben-Sorek, Esq.

**HURLEY, Senior District Judge:**

Plaintiff Matthew Prince brings the present action pursuant to 42 U.S.C. § 1983 alleging that defendants Nassau County, Brian Fitzgerald, Richard Soto, Richard Hermann, Arnold Rothenberg, and Scott Tusa harassed him and caused his employment to be terminated in retaliation for plaintiff's testifying before a Grand Jury, as well as plaintiff's involvement with a complaint his parents filed with the Nassau County District Attorney and the Nassau County Police Department's Internal Affairs Unit. Plaintiff alleges that defendants violated his First Amendment and Due Process rights as well as the New York State Constitution.[1] Plaintiff also asserts state law claims for tortious interference with business relations and intentional infliction of emotional distress. Defendants have moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons that follow, defendants' motion is granted in part and denied in part.

## *BACKGROUND*

The material facts, drawn from the Complaint and the parties' Local Civil Rule 56.1 Statements, are undisputed unless otherwise noted.

### *The Parties*

Plaintiff has been employed in the hospitality industry on Long Island since approximately 1994 and worked at a bar-restaurant located in Uniondale, New York that was known initially as Bogart's and then as Chrebet's. Defendant Nassau County (the "County") is a municipal corporation duly organized and existing under the laws of the State of New York.

---

[1] Defendants Fitzgerald, Soto and Hermann were initially named in the caption as "John" Fitzgerald, "John" Soto, and "John Herman," respectively.

Defendant Tusa is employed by the Nassau County Office of the Fire Marshal ("Fire Marshal") and has served as the Division Supervisor of the General Inspection Division since late 2004. The remaining individual defendants are or were employed by the Nassau County Police Department ("Police Department"): (1) Soto as a Sergeant in the First Precinct beginning in December 2005, (2) Rothenberg as a Sergeant in the First Precinct beginning in January 2006, (3) Fitzgerald as a Lieutenant Desk Officer in the First Precinct between December 2006 and July 2009, (4) Hermann as a Sergeant in the First Precinct beginning in January 2006.

Bogart's was opened in 1994 by Prince News Corp., a corporation owned by plaintiff's parents, and was operated as a licensed bar and restaurant. Between 1994 and 2006, plaintiff regularly worked at Bogart's in various capacities, including bartender, deejay, or consultant. Although plaintiff does not dispute defendants' contention that he worked as a manager at Bogart's (*see* Defs.' 56.1 ¶ 7), he, nonetheless, contends that he was never "the manager" at Bogart's and whenever plaintiff worked at Bogart's "there was always a manager on duty" (*see* Pl.'s 56.1 ¶¶ 187, 188).

On the weekends, Bogart's could be open as late as 4:00 a.m. Bogart's had a maximum total public occupancy of 330, which included up to 270 patrons on the main level and up to 60 patrons on the lower level. Defendants contend that between April 2000 and May 2003, there were approximately 350 calls for police service and assistance made in connection with "incidents at Bogart's," which included "conditions, aided cases, assaults, and fights." (Defs.' 56.1 ¶ 45.) Plaintiff disputes the accuracy of that number, noting that the underlying data shows that the records of those 350 calls included duplicative entries, logs of "hang-ups," and records of calls that ultimately had nothing to do with Bogart's.

***Defendants' Presence at Bogart's Prior to October 2002***

The parties agree that between January and October 2002, Bogart's was issued approximately six or seven appearance tickets and multiple referrals to the New York State Liquor Authority ("SLA") based upon claimed violations for underage drinking, disorderly premises, unsupervised premises, and failure to post licenses. (Defs.' 56.1 ¶ 8.) Between 1994 and October 2002, the Police Department and Fire Marshal issued seventy-five appearance tickets, completed one case report, and made twelve arrests at Bogart's. (*Id.* ¶ 46.)

According to plaintiff, in August 2002 the police responded to a call made from Bogart's requesting assistance with an individual that was standing outside with a knife. (Pl.'s 56.1 ¶ 217.) Plaintiff asserts that he had actually chased the individual down the street and pulled the knife from his hands. Plaintiff returned to the bar, and the police arrested the individual. Sergeant Jean Flynn, also of the First Precinct, began yelling at plaintiff "and was in his face." (*Id.*) As plaintiff "was responding," First Precinct Police Officer Michael Moran "grabbed [plaintiff's] right arm, twisted it behind his back and slammed [plaintiff] down onto the bar in the presence of patrons." (*Id.*) Plaintiff alleges that his arm was "black and blue from the incident and he had shoulder pain." (*Id.* ¶ 218.)

Defendants' version of the August 2002 incident is somewhat different. According to defendants,[2] while First Precinct officers were investigating a stabbing at Bogart's, another disturbance broke out and Flynn was punched in the face by a female patron. (Ben-Sorek Decl., Ex. J.) Shortly after the assault on Flynn, plaintiff arrived at the bar and "got into a heated

---

[2]       The following version of events is taken from the Police Department IAU Report, dated January 11, 2005, which is discussed more fully, *infra*.

argument with [Flynn] about being issued an appearance ticket for the disorderly premises." (*Id.* at 7.) At that time, Moran "physically directed [plaintiff] away from" Flynn. (*Id.*) Video surveillance footage revealed that the entire physical encounter spanned about eight seconds. (*Id.*)

**The October 6, 2002 Incident**

At 1:55 a.m. on October 6, 2002, a fight erupted inside Bogart's, which resulted in two patrons, including Peter Fama, being ejected from the bar. Outside, Sergeant Ronald Nesbitt, Police Officer Collins, and three other officers were in the process of ticketing cars parked in front of Bogart's. The officers asked the ejected patrons to leave the premises, but the patrons refused and became verbally abusive. At the time, plaintiff was standing just outside Bogart's side door, approximately ten to fifteen feet away from the officers and patrons. Defendants contend that Fama physically assaulted one of the police officers; although plaintiff did not observe this assault, plaintiff does not dispute that it occurred. Plaintiff did observe three police officers physically assault Fama. The officers then arrested Fama for disorderly conduct and charged him with, *inter alia*, resisting arrest, obstruction of justice, and assault.

Subsequently, plaintiff was subpoenaed to testify before a Grand Jury regarding what he saw during the early morning hours of October 6, 2002. Plaintiff's testimony contradicted the police officers' version of the events in question, and plaintiff later learned from his attorney that the Grand Jury did not return an indictment against Fama. During his testimony before the Grand Jury, plaintiff identified only Collins. Plaintiff now contends, however, that documents produced during discovery make clear that Nesbitt was also at the scene. (*See* Pl.'s Response to Defs.' 56.1 ¶ 24.)

Plaintiff asserts that before he testified before the Grand Jury, Collins had always been "very nice and friendly" to him and there were no problems between them. (Pl.'s 56.1 ¶ 198.) Plaintiff asserts that just after he testified, however, Collins confronted plaintiff and a verbal exchange took place:

> Q:     . . . What was the exchange?
>
> A:     [Collins said,] So you testified today. I said yeah. He said you didn't say anything about me, did you? I said no, of course not. He said don't you F-ing lie to me. I said what are you talking about?
>
> He goes I got the transcript. I know every F-ing word you said and I'm going to take you out of your life for what you just did.

(*Id.* (citing Pl.'s Dep. at 81).)

Defendants does not appear to dispute that Collins made the attributed statements. Defendants assert, however, that Collins never informed plaintiff that Collins intended to tell, or did tell, other officers about plaintiff's Grand Jury testimony. (Defs.' 56.1 ¶ 29.) Plaintiff contends in response that he believed that Collins had, in fact, told other officers about his Grand Jury testimony "because officers treated him differently after his testimony." (Pl.'s Response to Defs.' 56.1 ¶ 29.) According to plaintiff, "Officers that liked me prior didn't like me post . . . prior to me testifying [it] was strictly business by the police. They did whatever they had to do. After [the testimony] it was personal. That's the difference." (Pl.'s Dep. at 98.) While plaintiff acknowledges that certain of the defendants testified during their depositions that they had no knowledge of plaintiff's Grand Jury testimony or the underlying assault about which he testified, plaintiff believes the difference in treatment that he received from the Police Department

subsequent to his testimony made it "obvious that the other officers were aware" of that testimony.  (Pl.'s Response to Defs.' 56.1 ¶ 30.)

According to plaintiff, after he testified before the Grand Jury, "[t]he police went on a rampage for [him]."  (Pl.'s Dep. at 82.)  In particular, plaintiff testified as follows:

> Every time [the police] walk in[to Bogart's] they're looking for me. Not looking for managers.  Looking for me.  The way I was spoken to, the way they hunted me down, the frequency of them showing up looking for me, just to the point of . . . harassment.

(*Id.* at 82-83.)  Plaintiff also asserts that, prior to his October 2002 Grand Jury testimony, the Police Department would conduct premises checks[3] of Bogart's by sending two police officers and one sergeant.  Plaintiff contends that after his Grand Jury testimony, however, the police "raided" Bogart's by sending more than just two police officers and one sergeant.  (Pl.'s 56.1 ¶200.)  Plaintiff also asserts that following his Grand Jury testimony, police officers would stand outside Bogart's, or sit outside in marked police vehicles, and tell potential patrons "not to go in the building" or that "if you would [not] like to spend the weekend in jail I wouldn't come here tonight."  (Pl.'s Dep. at 87-88.)

***Nesbitt's Alleged Conduct***

Plaintiff asserts that Nesbitt harassed him, both before and after his Grand Jury testimony. According to plaintiff, Nesbitt would come to Bogart's at least once per week, every week. Sometimes, Nesbitt would simply park his marked police vehicle car in front of the bar and leave his lights flashing.  Other times, Nesbitt would enter the bar, speak to the manager on duty, and

---

[3]     Plaintiff defined a "premises check" as a "walk-through" conducted by police officers and a sergeant to check the bar's licenses and to see if any underage patrons were inside. (Pl.'s Dep. at 86.)

ask for plaintiff. When plaintiff confronted him, Nesbitt smiled and said that he asked for plaintiff "because I like you, Matty." (Pl.'s Dep. at 63.) Plaintiff asserts that Nesbitt also approached patrons and told them "they shouldn't be in this place, that he's going to shut down this place." (*Id.* at 65.) Plaintiff asserts that although Nesbitt's conduct pre-dated October 2002, Nesbitt "stepped it up a notch" after plaintiff's Grand Jury testimony. (*Id.* at 153.)

Defendants dispute the majority of plaintiff's allegations regarding Nesbitt's conduct. Nesbitt testified that, beginning in 2001, he would go to Bogart's two or three times per month to conduct inspections or checks of the location. (Nesbitt Dep. at 44.) According to Nesbitt, the reason for that frequency of his visits was "the culmination . . . of many, many, many calls for assistance" and a high volume of fights at that location. (*Id.* at 45.) Nesbitt testified that on five or six occasions he was assigned to go to Bogart's and write tickets, and on eight to ten occasions he went to Bogart's without being assigned. (*Id.* at 48-49.) Nesbitt acknowledged that on a "couple" of occasions, he parked his marked police vehicle on the sidewalk in front of Bogart's when there were cars parked illegally in front of the bar. (*Id.* at 50-51.) Nesbitt denied, however, that he ever parked his car in front of Bogart's in an effort to discourage patrons from entering the bar. (*Id.* at 53.) Although Nesbitt was assigned to patrol Zone D of the First Precinct, he would "quite often" find himself assigned to patrol Zone A, in which Bogart's was located. (*Id.* at 57.) Nesbitt testified that he never requested to patrol Zone A. (*Id.* at 58.)

### The IAU Complaint

In October 2002, plaintiff's parents, Allan and Pamela Prince, filed a harassment complaint against the Police Department with the Nassau County District Attorney and the Police Department's Internal Affairs Unit ("IAU"). One document in the record, which appears to be a

complaint intake form used by the Nassau County District Attorney's Office, indicates that the complaint was initiated on October 11, 2002. (Ben-Sorek Decl, Ex. K.) That document identifies the complainants as Brian Griffin (plaintiff's parents' attorney), plaintiff, and "Alan Prince." (*Id.*) The complaint alleges that between July 2, 2002 and October 11, 2002, "Sgt. Nesbitt and Members of the 1st Pct. have engaged in harassment of the Bar's owners, employees, and patrons. As part of [the] harassment, . . . several people have been subject to excessive force and then wrongfully charged [with] assault [in the second] degree." (*Id.*)

On October 21, 2001, plaintiff's parents and their attorney met with Detective Lieutenant John W. Feil of the Police Department's IAU to discuss their complaint. (Ben-Sorek Decl., Ex. L.) A summary of the information discussed during that meeting is contained in a Complaint Tracking Form. (*Id.*) That form reflects that the complaint was based in part on the conduct of Nesbitt, whom plaintiff's parents believed was "single-handedly attempting to put them out of business by telling their employees they better find new jobs soon," and "[going] out of his way to issue tickets to their son, Matthew." (*Id.*) The complaint was also based on the August 2002 incident involving Flynn and Moran. (*Id.*) Finally, the complaint alleged that "additional persons were assaulted by police during other licensed premises checks." (*Id.*) Detective Lieutenant Ralph T. Hoffman conducted the investigation of the complaint. (Ben-Sorek Decl., Ex. J at 1.)

During his deposition, plaintiff testified that the complaint "wasn't my lawsuit. It was my parents[']." (Pl.'s Dep. at 124.) Nonetheless, as part of his opposition to the present motion, plaintiff sets forth numerous objections to the manner in which his parents' complaint was investigated, including the following: (1) Hoffman did not commence his investigation until June

2003 (Pl.'s 56.1 ¶ 221), (2) Hoffman interviewed only one of the eleven witnesses who submitted

statements on behalf of plaintiff's parents because, in his view, many of the statements were in

the same handwriting and all of the statements were considered "self-serving" and "prejudicial"

(Pl.'s 56.1 ¶¶ 222, 223; Ben-Sorek Decl., Ex. J at 2-3), (3) Hoffman did not interview plaintiff's

parents, even though he "generally interviewed the complaining party" (Pl.'s 56.1 ¶ 223), but

Hoffman did meet with Nesbitt, Moran, and Flynn to discuss the allegations (*id.* ¶ 225), and (4)

the investigation did not conclude until January 11, 2005 – more than two years after it began (*id.*

¶ 226.)  Hoffman concluded that the allegations that Nesbitt unfairly targeted Bogart's and its

employees were "unfounded," the allegations that Nesbitt told Bogart's employees that they

should look for new jobs were "undetermined," and Moran was "exonerated" from any

allegations that he used excessive force during the August 2002 incident.  (*See* Ben-Sorek Decl.,

Ex. J at 9-11.)

### Defendants' Presence at Bogart's After October 2002

The parties do not dispute that between October 22, 2002 and the time Bogart's closed in

January 2005, multiple SLA referrals were issued for claimed violations for underage drinking,

overcrowding, disorderly premises, and failure to maintain exit-ways.  Defendants contend that

during the same time period, four appearance tickets were issued to plaintiff.  Plaintiff disputes

this assertion and claims that more than four appearance tickets were issued to him.  (Pl.'s

Response to Defs.' 56.1 ¶ 9.)  Moreover, plaintiff contends that the number of appearance tickets

issued during this time period does not accurately reflect the police presence at Bogart's during

this time frame.  (*Id.*)  For example, plaintiff contends that Nesbitt would often park his police

car in front of Bogart's but not make any official record of doing so.  (*Id.*)

Between November 2002 and June 2005, the Police Department and Fire Marshal issued fifty-six appearance tickets, completed eight case reports, and made three arrests at Bogart's. The bar also had its liquor license suspended twice by the SLA during this time frame.

On September 26, 2003, Fire Marshal Krummenacker visited Bogart's for a safety inspection and issued three tickets to Prince News Corp. d/b/a Bogart's and issued two tickets to plaintiff based on overcrowding and improper maintenance of exit-ways. Plaintiff contends that these tickets were improperly issued to him because he was neither the owner nor manager of Bogart's. On September 15, 2005, Nassau County District Court Judge Pardes issued a bench warrant (the "Bench Warrant") for plaintiff based upon his failure to appear in response to the September 26, 2003 tickets.

***Bogart's Change in Ownership***

On April 1, 2004, plaintiff's parents, as representatives of Prince News Corp. d/b/a Bogart's, surrendered their liquor license to the SLA. According to plaintiff, his parents took this action because the "police were harassing [and] looking for [him]" and his "family had enough of it." (Pl.'s Dep. at 59.) Plaintiff testified that the "final straw" came in August 2003, when Bogart's received a ticket in connection with an alleged rape that occurred in the bar. (Pl.'s 56.1 ¶ 232 (citing Pl.'s Dep. at 164-75).) According to plaintiff, the alleged victim had admitted that no rape had occurred and the entire incident was nothing more than "trumped-up charges by the police." (Pl.'s Dep. at 165.)

Lisa and David Dobins, through their corporation A-Leet Enterprises, became the new owners of Bogart's. Plaintiff was retained by A-Leet Enterprises as a consultant and was tasked with advising Lisa and David Dobins "how to run" a bar/restaurant. (Pl.'s Dep. at 103.) As a

consultant, plaintiff was expected to be available by telephone at any time, but had no set working hours at the bar. (*Id.* at 103-04.) A-Leet Enterprises applied for a new liquor license for Bogart's, and the SLA issued the license to A-Leet Enterprises d/b/a Bogart's.

On March 11, 2005, the Dobins sent their two attorneys and plaintiff to meet with Tusa and Mark DeLuca, another Fire Marshal. The purpose of the meeting was to determine why the Fire Marshal was "harass[ing]" Bogart's by coming to the bar frequently and issuing numerous, and allegedly meritless, tickets. (*See* Pl.'s 56.1 ¶ 238.) According to Tusa, he stated during the meeting that the fire marshals have to come to Bogart's frequently because "we're getting a lot of complaints at the location, or there's a lot of problems at the location." (Tusa Dep. at 98-99.) Tusa denied harassing the Dobins or Bogart's and told their attorneys that "[w]e just need them to do what they need to do." (*Id.* at 98.) Plaintiff, in contrast, described the meeting as a "very cold conversation" and recounted Tusa's alleged statement that "we have the right to come in whenever we want to come in." (Pl.'s Dep. at 239.) According to plaintiff, "the fire marshals didn't come to be helpful, they came there to put fear into them and [Tusa] sa[id], 'this is the way it is, and if you think calling your attorney to call us is going to stop,' basically, 'think again.'" (*Id.* at 240.) The day after the meeting, fire marshals went to Bogart's for an overcrowding check and arrested Fabrizio Glick, the manager, based upon charges of overcrowding, failure to maintain an accurate count, and criminal nuisance. (*See* DeLuca Dep. at 125-126.)

In October 2005, the liquor license held by A-Leet Enterprises d/b/a Bogart's was suspended because plaintiff had been ticketed for violations of overcrowding and underage drinking. Bogart's closed in January 2006. According to plaintiff, A-Leet Enterprises stopped operating Bogart's "[because the police were crazed about Matt Prince and David and Lisa

[Dobins] couldn't take it any more.  They couldn't run their place."  (Pl.'s Dep. at 104.)

***Chrebet's Opens for Business***

In early 2006, Wayne Chrebet, a former professional football player, decided to open an upscale restaurant at the former Bogart's location.  Plaintiff and Chrebet had known each other from college and the two agreed to work together on the venture, with Chrebet investing money to renovate the premises and plaintiff "run[ning] the place."  (Pl.'s 56.1 ¶¶ 245, 246.)  Chrebet entered into a twenty-five year lease with the landlord to secure the location.  (*Id.* ¶ 248.)  According to plaintiff, he and Chrebet initially agreed to enter into business "as partners."  (Pl.'s 56.1 ¶ 249; Pl.'s Dep. at 190.)  However, in May 2006, plaintiff, Chrebet, and Chrebet's Inc. (the "Corporation") entered into a consulting agreement (the "First Agreement").  (Pl.'s Ex. 13.)  The First Agreement acknowledged that the Corporation would expend at least $680,000 to build and renovate Chrebet's.  (*Id.* ¶ 2.)  The First Agreement provided that plaintiff would serve as a consultant to the Corporation and would receive some compensation.[4]  The First Agreement further provided that it would become effective on May 1, 2006 and would remain in effect "until MATTHEW becomes a shareholder in the CORPORATION or until such time as MATTHEW shall voluntarily withdraw from this Consulting Agreement."  (*Id.* ¶¶ 2, 5.)  Plaintiff testified, however, that he was never actually compensated pursuant to the First Agreement because "our agreement was it didn't kick in until the doors opened."  (Pl.'s Dep. at 213.)  At some point, however, Chrebet began to provide plaintiff with $1,000 per week as "living money."  (*Id.* at 216.)

---

[4]      The parties have not supplied the Court with the second page of the First Agreement.  (*See* Pl.'s Ex. 13.)  Plaintiff testified that pursuant to the First Agreement he was to receive $3,000 per week, plus 60% of the Corporation's profits.  (Pl.'s Dep. at 211-12.)

Between Spring 2006 and March 2007, plaintiff helped design and renovate "Chrebet's Bar and Restaurant" ("Chrebet's") with the goal of transforming it into an upscale restaurant. Plaintiff also oversaw the hiring of staff members, with the assistance of two managers, Jen Shin and Christopher Green. (Pl.'s Dep. at 205.) According to plaintiff, in approximately late February 2006, plaintiff and Chrebet submitted an application to the SLA for a liquor license for Chrebet's. (Pl.'s Dep. at 193-94.) At some point after that, the SLA imposed a two-year ban on the issuance of any liquor license for that building. (*Id.* at 193.) Plaintiff believed the reason for the ban was the number of tickets that had been issued for the premises in prior years. (*Id.* at 196.) According to plaintiff, the building's landlord hired an attorney who was able to get the ban lifted in approximately August 2006. (*Id.* at 195.) Subsequently, Chrebet submitted another application for a liquor license (in the name of the Corporation only), which was approved. (*Id.* at 196.)

Shortly before Chrebet's opened in March 2007, plaintiff alleges that the fire marshals performed a "final inspection." (Pl.'s 56.1 ¶ 259.) According to plaintiff, DeLuca commented: "Matt, if I knew you built such beautiful places, I would show you many other locations I could help shut down and you could bring another sports start here to our island." (*Id.* (quoting Pl.'s Dep. at 220-21).) Plaintiff asserts the Chrebet's did not pass the inspection because of an issue with the sprinkler system. Plaintiff contends that DeLuca commented sarcastically, "Doesn't that suck?" (*Id.* ¶ 260 (citing Pl.'s Dep. at 222.) According to plaintiff, the sprinkler system was subsequently fixed and Chrebet's passed inspection. (*Id.* ¶ 261.)

On March 1, 2007, plaintiff, Chrebet, and Chrebet's Inc. entered into a "Consulting Agreement." According to plaintiff, the parties entered into this second agreement to formally

signify that plaintiff and Chrebet were not partners; plaintiff was only a consultant for the

Corporation. (Pl.'s Dep. at 190.) Such change was necessary, according to plaintiff, after his

attorney learned from the SLA that it would not issue any liquor license with plaintiff's name on

it. (*Id.* at 190-91.) Plaintiff further alleges that his attorney was told by a Mr. Buckley,

presumably employed by the SLA, that "they have had numerous phone calls from the captain of

the First Precinct not to issue a liquor license in [plaintiff's] name." (Pl.'s Dep. at 43.)

Pursuant to the Consulting Agreement, plaintiff was retained as a consultant to the

Corporation and agreed to "serve as a General Manager of Chrebet's Bar and Restaurant and

shall have full control over the management and operation of Chrebet's . . . ." (Ben-Sorek Decl,

Ex. G ¶¶ 2, 3.) Plaintiff was to receive compensation in the amount of $3,000 per week plus

55% of the profits of the Corporation. (*Id.* ¶ 4.) The Consulting Agreement provided that its

terms "shall remain in full force and effect for such period of time until MATTHEW becomes a

shareholder in the CORPORATION or until such time as MATTHEW shall voluntarily withdraw

from this Consulting Agreement." (*Id.* ¶ 2.)

Chrebet's opened for business in late March 2007 and plaintiff went there every day to

oversee different aspects of the business. Initially, Chrebet's operated solely as a steakhouse and

would stay open only until about 11:00 p.m. (Pl.'s Dep. at 218.) Chrebet's also had a lounge

area that would open at 8:00 p.m. and then close "early," between 11:00 p.m. and midnight, in

order to build a reputation "as an older place, as a place that wasn't for college kids." (*Id.* at

226.)

On March 30, 2007, fire marshals conducted a night safety inspection of Chrebet's and

observed no violations. On April 28, 2007, Soto and two other police officers conducted a

routine inspection of Chrebet's and observed no violations. Defendants contend that, at that time, Soto told Shin and Green that they must conspicuously post Chrebet's liquor and occupancy licenses, as well as other required signage, so that the Police Department and Fire Marshal could see them when they entered. (Defs.' 56.1 ¶ 69.) Plaintiff disputes this and contends that Soto testified that at the time of the referenced inspection, Chrebet's was not yet open for business and was, thus, not required to post any licenses. (Pl.'s Response to Defs.' 56.1 ¶ 69.) Plaintiff contends that Soto did not make any comments regarding the posting of licenses or signs at Chrebet's. (*Id.*)

### *The June 14, 2007 Incident*

Between March 2007 and June 2007, Chrebet's did well financially, and "it did not experience any problems with the police or fire marshals." (Pl.'s 56.1 ¶ 269.) On June 14, 2007, Chrebet's held the grand opening of its lounge area. The parties do not dispute that at 11:51 p.m., Timothy Marshall, a communications technician at "Firecom," received an anonymous complaint that the first and second floors of Chrebet's were overcrowded, and informed his direct supervisor, Robert Sutton. At 11:58 p.m., Sutton informed Fire Marshal Syzmanski of the overcrowding complaint, who then informed Tusa. Syzmanski and Fire Marshal Pilczk went to Chrebet's and waited for Tusa to arrive. When Tusa arrived, Syzmanski and Pilczk told him the "place is jammed," they "can't get through the crowd," and they had asked Chrebet's employees to get the manager or owner. (Defs.' 56.1 ¶ 74.) The parties do not dispute that when fire marshals came to Chrebet's, they usually asked for "Fabrizio" or plaintiff because those were the names associated with the establishment. On this particular night, Tusa asked for plaintiff. Chrebet came outside and met with Tusa. According to plaintiff, Tusa continued to ask for

plaintiff even though Chrebet had introduced himself as the owner. (Pl.'s 56.1 ¶ 273.) Tusa told him that the "place appeared to be 'overcrowded,'" and that the fire marshals "'were going to count the place out.'" (Defs.' 56.1 ¶ 80 (quoting Tusa Dep. at 142).)

Meanwhile, at approximately 12:30 a.m., Soto responded to a call to assist the fire marshals at Chrebet's, and arrived after all of the fire marshals. According to plaintiff, in total approximately eight to ten police officers, including Soto, as well as fire marshals, including Tusa, entered Chrebet's. (Pl.'s 56.1 ¶ 270.) There were not enough fire marshals present to cover each of the exits to do the head count, so Soto and other police officers assisted in moving people out of the building. Tusa claims that he told Chrebet to "turn up the lights, have the deejay stop the music and make an announcement for everybody to exit through the front door in an orderly fashion, and Chrebet complied." (Defs.' 56.1 ¶ 81 (internal quotation marks omitted).) Plaintiff contends that Tusa "ordered" that the lights be turned on and that Tusa "rudely ushered all of the patrons out of the restaurant." (Pl.'s Response to Defs.' 56.1 ¶ 81.)

Tusa performed a head count of the patrons using a "clicker" and Syzmanski performed a "stick figure count." (Defs.' 56.1 ¶ 82.) Tusa claims that the head count lasted for approximately a half-hour, while plaintiff asserts that the count "took an extremely long time" and that the police and fire marshals "were making sure that this place had no shot of reopening that night." (Pl.'s Response to Defs.' 56.1 ¶ 83.) Defendants assert that the head count revealed 573 patrons were in Chrebet's, which exceeded the total maximum occupancy of 330 patrons. (Defs.' 56.1 ¶ 84.) Plaintiff disputes the results of this count, and insists that there were less than 330 patrons inside. (PL.'s Response to Defs.' 56.1 ¶ 84.) According to plaintiff, Chrebet requested that he be allowed to count along with the fire marshals, but he was denied. (Pl.'s 56.1

¶ 275.)

Syzmanski issued appearance tickets and forthwith orders based not only on the overcrowding violation, but also for a locked patio gate. Plaintiff concedes that Syzmanski issued a ticket to Chrebet's for a locked patio gate, but contends that the patio gate was not actually locked. (Pl.'s Response to Defs.' 56.1 ¶ 77.) After being at Chrebet's for approximately one hour, Tusa left the premises between 1:00 a.m. and 1:15 a.m.

Subsequently, Soto went inside to perform a licensed premises check. Defendants claim that Soto observed that the signage for underage drinking and alcohol consumption by pregnant women were not posted appropriately, and that the liquor license and public assembly license were not properly displayed. Soto did not issue any tickets, but gave a warning to Chrebet instead. According to defendants, Soto explained to Chrebet that his establishment was overcrowded and that he had already warned Shin months ago that all required signs must be conspicuously posted. (Defs.' 56.1 ¶ 89.) Plaintiff disputes that Chrebet's had committed any signage violations and contends that the original licenses were kept in a binder and copies were displayed on the wall. (Pl.'s Response to Defs.' 56.1 ¶ 87.)[5] Soto left Chrebet's at 1:30 a.m. and did not make any referrals to the SLA.

*June 22, 2007 Incident*

Defendants assert that at 12:40 a.m. on June 22, 2007, Soto was dispatched to Chrebet's

_____

[5]      Plaintiff insists that "Sergeant Hermann also acknowledged that Chrebet's properly displayed its licenses 'in frames on the wall when you walk in the door.'" (Pl.'s Response to Defs.' 56.1 ¶ 87 (quoting Hermann Dep. at 149).) The Court notes, however, that in the portion of Hermann's deposition testimony relied upon by plaintiff, Hermann is describing a premises check that he made in November 2007 – not on the night of June 14, 2007. (*See* Hermann Dep. at 149.)

in response to an anonymous 911 call about a fight at that location. (Defs.' 56.1 ¶ 91.) Plaintiff disputes that such a 911 call was actually made, arguing that "when a person makes a 911 call, he/she typically waits for the police to arrive," but "[n]o one was waiting for the police to arrive on that date." (Pl.'s Response to Defs.' 56.1 ¶ 91.) In any event, plaintiff denies that there was any fight at Chrebet's that night. (*Id.*) Finally, plaintiff contends that eight police officers, including Soto, and two fire marshals came to Chrebet's that night. (Pl.'s 56.1 ¶ 283.)

According to Soto, upon his arrival he did not see any signs of a fight outside, and asked three employees what was going on inside and who was in charge. Soto contends that the three employees did not respond. (Defs.' 56.1 ¶ 92.) Soto and other police officers entered Chrebet's and directed the employees to turn the lights on and the music off. Soto asserts that he asked the bartenders and other employees who was in charge and received no response. (Defs.' 56.1 ¶ 94.) Ultimately, an employee named Fabrizio Glick told Soto that plaintiff was in charge. Plaintiff disputes that any Chrebet's employee failed to respond to Soto and asserts that when Soto arrived he spoke with Glick, and Glick immediately informed Soto that plaintiff was in charge. (Pl.'s Response to Defs.' 56.1 ¶¶ 92, 94.)

The parties dispute what happened next. Soto claims that plaintiff approached him and said that he (plaintiff) was not in charge, and that he was only a consultant for Chrebet. (Defs.' 56.1 ¶ 96.) Soto testified that he asked plaintiff about the fight, and plaintiff insisted the fight was outside – not inside Chrebet's. (*Id.* ¶ 97.) Soto asked plaintiff for the liquor license and public assembly license, and plaintiff brought him a binder containing those licenses. Soto claims that the licenses were not properly displayed on the wall as required (*Id.* ¶¶ 98, 99), thereupon he went to his car to get his summons book to write up the violations and check

plaintiff for any outstanding warrants through the car computer system. (*Id.* ¶ 100.) According to Soto, he normally checks an individual for outstanding warrants when he writes a summons. (*Id.*) Soto discovered the open Bench Warrant for plaintiff issued in 2005 and arrested plaintiff based upon that Bench Warrant. (*Id.* ¶ 101.) Soto filled out a licensed premises report and informed plaintiff that a referral was being made to the SLA. (*Id.* ¶ 102.) Plaintiff was issued appearance tickets for the failure to display required signs and improper posting of licenses. (*Id.* ¶ 103.) At 1:20 a.m., plaintiff was transported back to the First Precinct. (*Id.* ¶ 104.) Hours later, plaintiff was arraigned in district court and released. (*Id.* ¶ 105.)

Plaintiff sets forth a different version of these events. According to plaintiff, when he initially approached Soto, he informed him "I'm in charge tonight." (Pl.'s Response to Defs.' 56.1 ¶ 96.) Plaintiff contends that he was not aware of any fight in the bar and did not discuss any fight with Soto. (*Id.* ¶ 97.) Plaintiff also asserts that copies of the required licenses were posted on the wall. (*Id.* ¶ 99.)[6] According to plaintiff, "Soto was clearly looking for a reason to further harass him." (*Id.* ¶ 100.) At some point, Soto told plaintiff "I'm going to be your new Sergeant Scalone." (*Id.*) Soto then asked plaintiff for his driver's license "for no apparent reason," and when he returned from his vehicle, Soto stated "Isn't today my lucky day? I get to arrest you." (*Id.*) Soto did not inform plaintiff why he was being arrested. (*Id.*)

Plaintiff claims that Soto effectuated the arrest by pushing plaintiff up against the wall, handcuffing him, and laughing at him – all in front of Chrebet's patrons. (Pl.'s 56.1 ¶ 298.)

---

[6] As support for his assertion that the licenses were properly posted, plaintiff again cites to Hermann's testimony that during a premises check he found that the licenses were properly displayed. (Pl.'s Response to Defs.' 56.1 ¶ 99.) As noted above, however, the cited portion of Hermann's testimony refers to a premises check he did in November 2007 – not on June 22, 2007. (*See* Hermann Dep. at 149.)

Plaintiff was then transferred to the First Precinct where he was "chained to a drug addict." (Pl.'s 56.1 ¶¶ 299, 304.) Plaintiff alleges that Soto confronted him in jail and told plaintiff: "You're going to see me a lot. Get used to seeing my face." (*Id.* ¶ 306.) Plaintiff asserts that "[o]ne of the two officers that transported Prince [from Chrebet's to the First Precinct] felt so terrible about how Soto had treated him that he apologized to Prince the next day." (*Id.* ¶ 309.)

### *June 27, 2007 Meeting with Chrebet and the Fire Marshals*

After plaintiff's arrest, Chrebet told plaintiff not to come back to Chrebet's until Chrebet got "answers from the County [as to] why they're doing this to us." (Pl.'s 56.1 ¶ 310.) Chrebet requested that his attorney, Joe Margiotta, arrange a meeting with the Police Department and Fire Marshal (*Id.* ¶ 311), and so, with the assistance of a mutual friend, Frank Antitomaso, Margiotta did set up a meeting with Fire Marshal Krummenacker. Thereafter, on June 27, 2007, Chrebet, Krummenacker, Antitomaso, Margiotta and an individual whom defendants describe as "a police officer" had a lunch meeting at Chrebet's. (Defs.' 56.1 ¶¶ 108, 109.) According to defendants, Krummenacker attended the meeting in his "individual capacity." (*Id.* ¶ 108.) Defendants assert that after Margiotta told Krummenacker that Chrebet was concerned about the incidents that occurred at Chrebet's and asked how their problems could be corrected, Krummenacker told Chrebet that his employees must ensure that the number of patrons allowed into Chrebet's did not exceed the allowable occupancy. (*Id.* ¶¶ 110-11.) According to defendants, Chrebet showed Krummenacker a binder containing the licenses and Krummenacker informed him that the licenses need to be conspicuously posted on the wall. (*Id.* ¶ 112.) Krummenacker explained to Chrebet that when the fire marshals come to Chrebet's, they expect cooperation from the employees and "that if [Chrebet] did not comply with [these] basic items . . . that his problems

would continue with law enforcement, the fire marshals." (*Id.* ¶ 113.) Defendants allege that near the end of the meeting, Margiotta told Chrebet that "it sounds like you have a problem with your manager here." (*Id.* ¶ 114.) In response, Chrebet allegedly commented that he had a long personal history with his manager, i.e., plaintiff, but that he would speak to plaintiff and "get a better understanding of what has to be done." (*Id.* ¶ 115.) Defendants maintain that Krummenacker never told Chrebet that he should change managers or fire plaintiff, and that Krummenacker never stated that "things would be easier if there was a new manager." (*Id.* ¶ 116.)

Plaintiff disputes many of defendants' assertions regarding the June 27, 2007 meeting. First, plaintiff describes the individual who attended the meeting in addition to Krummenacker, Margiotta, Antitomaso, and Chrebet as "a high ranking police officer, Chief Kevin Lowrey." (Pl.'s 56.1 ¶ 314.) Plaintiff also asserts that Krummenacker did, in fact, attend the meeting in his official capacity. (Pl.'s Response to Defs.' 56.1 ¶108.) Contrary to defendants' assertions, Chrebet testified that Krummenacker told him during the meeting that "if I didn't get rid of Matt Prince, that these were the kind of problems that I was going to have." (Chrebet Dep. at 35.) Chrebet further testified that Lowrey told him he "was doing the right thing by getting rid of Prince." (*Id.* at 39-40.) Finally, Chrebet testified that during the meeting, he told his attorney (in front of everyone present) that getting rid of plaintiff was "what I would have to do." (*Id.* at 40.)

***Meeting with County Executive Suozzi***

As part of his opposition to the present motion, plaintiff submitted an affidavit signed by

Chrebet, which states that on July 2, 2007,[7] Chrebet and Margiotta met with then-Nassau County

Executive Thomas Suozzi in Suozzi's office in Mineola, New York. (Chrebet Aff. ¶ 2.)[8] In his

affidavit, Chrebet does not specify the purpose and nature of the meeting other than to state that

"[a]t the Meeting, Mr. Margiotta introduced me to Mr. Suozzi and discussed a number of issues

with Mr. Suozzi." (*Id.* ¶ 4.) According to Chrebet, during the meeting "with Mr. Suozzi,

amongst other unrelated issues, Mr. Margiotta mentioned that the 'problem at my restaurant' had

been taken care of, (referring to the termination of Matthew Prince), and Mr. Suozzi replied, 'I

am aware of that.'" (*Id.* ¶ 6.)

***The Relationship Between Plaintiff and Chrebet Ends***

On July 5, 2007, Chrebet "reached an agreement to compensate Matthew Prince in

exchange for voiding [their] business agreement and severing [their] business relations." (Defs.'

56.1 ¶ 16 (internal quotation marks omitted, alterations in the original); Pl.'s 56.1 ¶ 322.)

Plaintiff visited Chrebet's only one time after his termination, in August 2007, when he went to

the bar for a beer and hamburger. (Pl.'s 56.1 ¶ 325.) According to plaintiff, he did not return

after that because he had learned that "the police would come to Chrebet's and ask the

---

[7]       Chrebet's affidavit originally reflected that the meeting took place on July 2,
2010. (Chrebet Aff. ¶ 2.) On the affidavit, the "10" of the year 2010 is manually crossed out and
"08" is handwritten above, followed by the initials "WC." (*Id.*) Thus, the corrected affidavit
states that the meeting occurred on July 2, 2008. However, plaintiff has submitted an excerpt
from Suozzi's date book showing that Margiotta and Chrebet had an appointment to meet with
Suozzi at 1:00 p.m. on July 2, 2007 – not July 2, 2008. (*See* Pl.'s Ex. 14.) Defendants have not
disputed that this meeting did, in fact, occur on July 2, 2007.

[8]       Chrebet was deposed in connection with a separate action that he has commenced
against, *inter alia*, the County on March 4, 2009. Chrebet's affidavit submitted in this action is
dated December 15, 2010. It does not appear that Chrebet testified during his deposition about
the July 2, 2007 meeting with Suozzi.

23

[employees], 'Where's Matt Prince?  We heard Matt Prince runs this place still.  If we find Matt Prince, we told him what happened.'" (*Id.* ¶ 327.)  Plaintiff also alleges that, on an unspecified number of occasions, Hermann "would come to Chrebet's, grab female workers and demand to know what Prince had to do with the place."  (*Id.* ¶ 329.)

### Notice of Claim

On September 12, 2007, plaintiff filed a Notice of Claim with Nassau County.  This fact, while mentioned in passing by plaintiff in his motion papers (*see* Pl.'s Opp'n at 16), appears to play no role, pivotal or otherwise, in his claims of retaliation.  Nonetheless, the individual defendants contend that they were not aware of this Notice of Claim until the Complaint in the present action was filed, while plaintiff points out that Fitzgerald and Rothenberg never expressly testified to that effect during their depositions.  (Pl.'s Response to Defs.' 56.1 ¶ 41.)

### Subsequent Police and Fire Marshal Presence at Chrebet's

From June 22, 2007 until Chrebet's closed in August 2008, as discussed *infra*, there were no complaints of overcrowding at Chrebet's.  (Defs.' 56.1 ¶ 106.)  There were, however, several other occasions on which the Fire Marshal and Police Department visited Chrebet's.  For example, on November 9, 2007, at 2:51 a.m., Hermann was dispatched to Chrebet's based upon reports that two individuals had been assaulted by Chrebet's staff members.  (Defs.' 56.1 ¶ 118.)  When Hermann arrived, Chrebet's employees informed him that the individuals in question had pushed their way into the bar after closing time and had been physically escorted out by Chrebet's staff.  (*Id.* ¶ 119.)  Hermann asked for the manager and, upon not receiving a response, stated "If somebody doesn't tell me who's in charge here, then I'll be back tomorrow taking a zero tolerance policy.  I'll be back with the fire marshal and the building inspector."  (*Id.* ¶¶ 120-

21.)  A promotions manager then identified himself, and Hermann was taken into an upstairs office to review a video of the incident.  (*Id.* ¶¶ 122-23.)  Subsequently, Hermann conducted a premises check and, after noting that the required licenses were properly displayed on the wall, Hermann did not issue any tickets.  (*Id.* ¶¶ 124-26.)  Hermann did, however, make a referral to the SLA based upon what he perceived to be a failure to the manager to cooperate with the police.  (*Id.* ¶ 127.)  As Hermann left the premises, he "made up his mind to return with the building inspector and Fire Marshal the next day."  (*Id.* ¶ 128.)  At 5:03 a.m., Hermann sent an email to all supervisors in the First Precinct "informing them that he was taking [a] zero tolerance approach to Chrebet's based upon the refusal of the managers and staff to cooperate with him."  (*Id.* ¶ 129.)

The next day, Hermann returned to Chrebet's with two building inspectors, three fire marshals – including Tusa and DeLuca – and at least four police officers.  After inspecting the premises, the fire marshals issued forthwith orders for, *inter alia*, concealed sprinkler head caps, the building inspector issued five tickets to Chrebet's, and Hermann filled out a licensed premises report.  According to defendants, when they entered the premises they asked for the manager.  Plaintiff disputes this and contends that when the group arrived, they asked for plaintiff by name.  (*See* Defs.' 56.1 ¶ 132; Pl.'s Response to Defs.' 56.1 ¶ 132.)  Plaintiff further contends that on both November 9 and 10, 2007, "the fire marshal and police" "told Chrebet's that if they caught Prince working at the place that they would shut down the place."  (Pl.'s 56.1 ¶¶ 330-31.)

On March 3, 2008, Hermann circulated an email stating that he intended to organize a "bar detail" involving the Police Department, Fire Marshal, building inspector, and SLA in order

to conduct licensed premises checks for several bars and restaurants, including Chrebet's. (Defs.' 56.1 ¶ 140.) Hermann testified that he chose to include Chrebet's on the list of establishments to be checked because he had been informed that "Prince was now running the place and was using a certain promoter that had been trouble in the past," although plaintiff contends that Hermann decided to visit Chrebet's almost immediately after hearing that plaintiff was supposedly involved in Chrebet's again. (*See id.* ¶ 141; Pl.'s Response to Defs.' 56.1 ¶ 141.)

On March 8, 2008, at approximately 12:20 a.m., Hermann returned to Chrebet's accompanied by Rothenberg and seven other police officers, as well as Fire Marshals DeLuca, Uttaro, and Syzmanski, two building inspectors, and an SLA representative. According to defendants, Hermann asked to speak the manager and, after two Chrebet's employees came forward, Hermann spoke to them and then inspected the required licenses on the first floor area. (Defs.' 56.1 ¶ 148.) Defendants further contend that Hermann then went up to the second floor, where he asked a female employee "whether Prince was working that night." (*Id.* ¶ 149.) The female employee "replied that Prince wasn't here." (*Id.* ¶ 150.) According to plaintiff, however, as soon as the group entered the premises they stated they were looking for plaintiff. (Pl.'s 56.1 ¶ 338.) When Hermann was told that plaintiff was not there, he went upstairs without permission to search for plaintiff and "questioned two employees about Prince's whereabouts." (*Id.*) According to plaintiff, "Hermann stated that Prince would be arrested if he was ever found at Chrebet's." (*Id.* ¶ 340.) Before the group left, a fire marshal issued a forthwith order for servicing the automatic fire extinguisher system and a building inspector issued a ticket for an obstructed exit.

***March 17, 2008 Meeting***

The parties do not dispute that on March 17, 2008, Wayne Chrebet, Sr. ("Chrebet, Sr.")[9] and Green (acting as Chrebet's business consultant) went to the First Precinct and requested a meeting. Fitzgerald and Rothenberg agreed and the four men met for between twenty and thirty minutes. The parties dispute what was said during the meeting. According to defendants, Chrebet, Sr. "was concerned about the parking enforcement around Chrebet's and wanted the police to overlook parking violations." (Defs.' 56.1 ¶ 159.) In response, Fitzgerald explained that any assistance in that regard would have to come from the Town of Hempstead, not the Police Department. (*Id.* ¶ 160.)

Defendants contend that Chrebet, Sr. then raised the issue of the Police Department's frequent visits to Chrebet's and "wanted to know if there was a problem, and what can be done to take care of those problems." (*Id.* ¶ 163.) Rothenberg replied that "our goal, like with every other establishment, is to have a prosperous, law abiding, thriving business, and . . . the one thing nobody wants is . . . a closed business." (*Id.* ¶ 164.) Defendants contend that Chrebet, Sr. asked if there were any issues with plaintiff, to which Rothenberg responded that Bogart's had "a lot of issues" with underage drinking and DWI arrests. (*Id.* ¶ 165.) According to defendants, Chrebet, Sr. explained that even though plaintiff was no longer involved in the business, he was concerned that Chrebet's "was being targeted because the police mistakenly believed that Prince" was still in the picture. (*Id.* ¶¶ 166-68.) Defendants contend that Chrebet, Sr. asked what could be done to ensure the plaintiff did not come back to Chrebet's. (*Id.* ¶ 169.) Rothenberg replied that

---

[9]     Wayne Chrebet, Sr. is Chrebet's father and, at some point, began "helping out at [his] son's restaurant." (Chrebet, Sr. Aff. ¶¶ 2, 3.)

Chrebet, Sr. should communicate to plaintiff that he is unwelcome so that "if he is present there after . . . that fact . . . you call us, then he can be arrested for trespassing." (*Id.* ¶ 170.)

Plaintiff has submitted an affidavit of Chrebet, Sr., which sets forth his version of the events that transpired during the March 17, 2008 meeting. (*See* Aff. of Wayne Chrebet, Sr., dated December 10, 2010 "Chrebet, Sr. Aff.") In that affidavit, Chrebet, Sr. denies requesting that the police "overlook" parking violations, and states that he cited the number of parking tickets written by the police as "the most recent example of this harassment." (*Id.* ¶ 11.) According to Chrebet, Sr., the real purpose of the meeting was to make "an effort to get [the police] to stop unfairly targeting Chrebet's." (*Id.* ¶ 5.)

According to Chrebet, Sr., Fitzgerald and Rothenberg stated that:

> [T]hey knew that Matthew Prince was still working for Chrebet's and that if I wanted the raids to stop, I should send a letter to Matthew Prince notifying him that if he comes to the restaurant, he would be arrested for trespassing. Fitzgerald and Rothenberg made it clear to me that Chrebet's would continue having problems with the police unless I prepared and sent such a letter to Matthew Prince, as Rothenberg requested.

(*Id.* ¶ 7.) Chrebet, Sr. denies that Rothenberg made the majority of statements attributed to Rothenberg by defendants, and insists that it was Rothenberg – not Chrebet, Sr. – who "first brought up Prince's name." (*Id.* ¶ 14.) Rothenberg, in turn, denies that he ever directed Chrebet, Sr. to prepare a letter to plaintiff. (Defs.' 56.1 ¶ 171.)

According to Chrebet, Sr., he returned to Chrebet's after the meeting and telephoned plaintiff "to tell [plaintiff] that based upon what the police had told [Chrebet, Sr.], [he] had no choice but to send [plaintiff] a letter notifying him that if he came to Chrebet's, he would be arrested for trespassing, and if he entered Chrebet's again the police would be called." (Chrebet,

Sr. Aff. ¶ 9.)  Thus, on March 19, 2008, Chrebet, Sr. composed a letter to Plaintiff and sent it to him.  (*Id.* ¶ 10.)  The letter informed plaintiff that he was not to "trespass" on Chrebet's property and that plaintiff no longer was "involved in" or had any "business association" with Chrebet's. (Ben-Sorek Decl, Ex. VVV.)  The letter stated that if plaintiff failed to comply with the conditions set forth therein, "we will be forced" to contact the police and have him arrested.  (*Id.*) The letter further set forth: "As you know and for reasons we discussed [via telephone], it is unfortunate it has come to this, but due to the position of the authorities we have no alternative." (*Id.*)  Fitzgerald testified that he subsequently told Chrebet, Sr. that the March 19, 2008 letter did not accurately reflect "our position," but Chrebet, Sr. denies that such a conversation ever took place.  (*See* Defs.' 56.1 ¶ 173; Pl.'s Response to Defs.' 56.1 ¶ 173.)

### *Chrebet's Closes*

Other than two minor incidents on June 3, 2008 and July 3, 2008, no other dispatches of the Police Department or Fire Marshal were made to Chrebet's between May 2008 and August 2008.  (*See* Defs.' 56.1 ¶¶ 174-79.)  Chrebet's closed in August 2008.  (*Id.* ¶ 180.)

Plaintiff asserts that he has been unable to secure other employment in the hospitality industry because "no one wants to go into business with him."  (Pl.'s 56.1 ¶ 366.)  Plaintiff asserts that, as a direct result of Chrebet's failure, his reputation has been severely damaged and he has been "blacklisted from [his] own industry."  (*Id.* ¶¶ 368-69.)  In addition, plaintiff asserts that he "lost his wife and family," as well as his friendship with Chrebet, due to the harassment he suffered at the hands of the Police Department and Fire Marshal.  (*Id.* ¶¶ 370-75.)

### *The Complaint*

The Complaint asserts claims under Section 1983 based upon defendants' alleged

retaliation against plaintiff for his testimony before the Grand Jury and his involvement in the

IAU Complaint filed by his parents.  Plaintiff alleges that defendants' conduct has violated his

First Amendment rights as well as his Fourteenth Amendment procedural due process rights.

Plaintiff asserts these Section 1983 claims against each of the individual defendants in their

official and individual capacities, as well as against the County.  Plaintiff also brings state law

claims for tortious interference with business relations and intentional infliction of emotional

distress, as well as claims for violations of the New York State Constitution.[10]

### DISCUSSION

**I.     Legal Standard**

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is only appropriate

where admissible evidence in the form of affidavits, deposition transcripts, or other

documentation demonstrates the absence of a genuine issue of material fact, and one party's

entitlement to judgment as a matter of law.  *See Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d

712, 716 (2d Cir. 1994).  The relevant governing law in each case determines which facts are

material; "only disputes over facts that might affect the outcome of the suit under the governing

law will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 248 (1986).  No genuinely triable factual issue exists when the moving party

demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all

inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could

---

[10]     While plaintiff originally also asserted claims for supervisory liability under
Section 1983, as well as a state law claim for negligent supervision, those claims have been
withdrawn.  (*See* Pl.'s Opp'n at 45.)  Plaintiff also states that he is not asserting "an independent
claim for conspiracy amongst defendants."  (*Id.*)

find in the non-movant's favor.  *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996) (citing Fed. R. Civ. P. 56(c)).

To defeat a summary judgment motion properly supported by affidavits, depositions, or other documentation, the non-movant must offer similar materials setting forth specific facts that show that there *is* a genuine issue of material fact to be tried.  *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996).  The non-movant must present more than a "scintilla of evidence," *Del. & Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (quoting *Anderson*, 477 U.S. at 252), or "some metaphysical doubt as to the material facts," *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), and cannot rely on the allegations in his or her pleadings, conclusory statements, or on "mere assertions that affidavits supporting the motion are not credible."  *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citations omitted).

The district court, in considering a summary judgment motion, must also be "mindful . . . of the underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925, 928 (5th Cir. 1997) (citing *Anderson*, 477 U.S. at 252), because "the evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions."  *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988).  Where the non-moving party will bear the ultimate burden of proof on an issue at trial, "the moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential element of the" non-movant's claim.  *Id.* at 210-11.  Where a movant without the underlying burden of proof offers evidence that the non-movant has failed to establish her claim,

the burden shifts to the non-movant to offer "persuasive evidence that [her] claim is not 'implausible.' " *Id.* (citing *Matsushita*, 475 U.S. at 587).

## II.     *Plaintiff's First Amendment Retaliation Claim*

### A.     *Application of the Statute of Limitations*

Defendants contend that plaintiff's First Amendment retaliation claim must be dismissed because plaintiff has failed to establish that he suffered any "adverse actions" at the hands of defendants, or that any such adverse actions were causally connected to plaintiff's First Amendment-protected activity.  (Defs.' Mem. at 14.)  Defendants also argue that plaintiff's claims based on Section 1983 is governed by a three year statute of limitations and because the Complaint in this action was filed on May 5, 2008, those claims may be based only upon evidence of conduct occurring on or after May 5, 2005.  In opposition, plaintiff asserts that he "has clearly alleged a continuing violation that stemmed from his testimony before the Grand Jury and IAU complaint in 2002."  (Pl.'s Opp'n at 33.)

### 1.     Legal Standard

In an action arising in New York pursuant to Section 1983, the applicable statute of limitations is borrowed from the "general or residual [state] statute [of limitations] for personal injury actions," which is three years.  *See Pearl v. City of Long Beach*, 296 F.3d 76, 79 (2d Cir. 2002) (citing *Owens v. Okure*, 488 U.S. 235, 249-50 (1989); N.Y. C.P.L.R. § 214(5)).  "Federal law determines when a section 1983 cause of action accrues," and the Second Circuit has held that "accrual occurs when the plaintiff knows or has reason to know of the injury which is the basis of his action."  *Id.* at 80 (internal quotation marks omitted); *see also Fabbricante v. City of N.Y.*, 2002 WL 34438898, at *6 (E.D.N.Y. Nov. 18, 2002)).

## 2.    **Application of the Continuing Violation Theory**

It appears clear that many of the events that form the basis of plaintiff's First Amendment retaliation claim occurred prior to May 5, 2005, i.e., more than three years before the filing of the Complaint.  Moreover, record evidence of plaintiff's conduct, and the conduct of his parents, in response to certain actions taken by defendants Police Department and Fire Marshal demonstrate that plaintiff was aware of such conduct prior to May 5, 2005.  For example, plaintiff alleges that Collins' threat (i.e., that he would take plaintiff "out of [his] life" following his Grand Jury testimony) was made directly to plaintiff in October 2002.  Furthermore, one of the two major topics of plaintiff's parents' IAU complaint was Nesbitt's alleged harassment of plaintiff that was occurring as of October 2002.  According to plaintiff, his parents surrendered the liquor license and sold Bogart's in April 2004 as a direct result of the police harassment directed at plaintiff.  Based on these facts, it is clear that this alleged conduct, which partially underlies plaintiff's First Amendment retaliation claim, is of the type that plaintiff knew or should have known prior to May 5, 2005.

Although plaintiff states in his motion papers that he is not asserting "an independent claim for conspiracy amongst defendants" (Pl.'s Opp'n at 45), the Complaint contains allegations that the Police Department and Fire Marshal engaged in the alleged conduct as part of a conspiracy to deprive him of his constitutional rights.  (*See, e.g.*, Compl. ¶¶ 86, 96.)  Such allegations, however, do not in any way alter the accrual date of plaintiff's Section 1983 claims.  The Second Circuit has made clear:

> The crucial time for accrual purposes is when the plaintiff becomes aware that he is suffering from a wrong for which damages may be recovered in a civil action.  To permit [the plaintiff] to wait and toll

33

> the running of the statute simply by asserting that a series of separate wrongs were committed pursuant to a conspiracy would be to enable [the plaintiff] to defeat the purpose of the time-bar, which is to preclude the resuscitation of stale claims.

*Singleton v. City of N.Y.*, 632 F.2d 185, 192 (2d Cir. 1980). Moreover, "[c]haracterizing defendants' separate wrongful acts as having been committed in furtherance of a conspiracy or as a 'series of interlocking events' does not postpone the accrual of claims based on individual wrongful acts." *Id.*

Plaintiff contends that he has alleged a "continuing violation" of his constitutional rights that "stemmed from his testimony before the Grand Jury and IAU complaint in 2002" and continued until Chrebet's closed for business in August 2008. (*See* Pl.'s Opp'n at 33-34.) The continuing violation theory provides that if "a plaintiff can demonstrate an ongoing or continuing violation of his federally protected rights, 'the plaintiff is entitled to bring suit challenging all conduct that was a part of the violation, even conduct that occurred outside the limitations period.'" *Yip v. Bd. of Trs. of the State Univ. of N.Y.*, 2004 WL 2202594, at *4 (W.D.N.Y. Sept. 29, 2004) (quoting *Cornwell v. Robinson*, 23 F.3d 694, 704 (2d Cir. 1994)). Courts within the Second Circuit, however, "consistently have looked unfavorably on continuing violation arguments" and "have applied the theory only under compelling circumstances." *Blankman v. Cnty. of Nassau*, 819 F. Supp. 198, 207 (E.D.N.Y. 1993) (quoting *Blesedell v. Mobil Oil Co.*, 708 F. Supp. 1408, 1415 (S.D.N.Y. 1989)) (internal quotation marks omitted). Compelling circumstances could include situations in which "the unlawful conduct takes place over a period of time, making it difficult to pinpoint the exact day the violation occurred," or "where there is a pattern of covert conduct such that the plaintiff only belatedly recognizes its unlawfulness." *Yip*,

2004 WL 2202594 at *4 (internal quotation marks omitted).  None of these circumstances are present in this case.

The Court finds that plaintiff has not established a continuing violation so as to allow him to base his First Amendment retaliation claim (or any of his other Section 1983 claims) upon alleged conduct that occurred prior to May 5, 2005.  To the extent plaintiff's claims arose out of conduct occurring prior to that date (including Collins' October 2002 threat, Nesbitt's harassment, and the appearance tickets issued to Bogart's), plaintiff knew or had reason to know of such claims as of that time.  Indeed, in October 2002 plaintiff's parents did file an IAU complaint regarding some of the same conduct now at issue here.  Moreover, to the extent plaintiff attempts to base his First Amendment retaliation claim on the investigation of the IAU complaint, he certainly knew or had reason to know of that claim as of the time the report was issued on January 11, 2005.  The Court finds, therefore, that due to the distinct and separate nature of each of the events alleged to have occurred prior to May 5, 2005, and in keeping with this Circuit's approach of applying the continuing violations theory only in compelling circumstances, the continuing violation theory does not apply to plaintiff's claims based upon alleged conduct that occurred prior to May 5, 2005.

### B.      Plaintiff's First Amendment Retaliation Claim is Dismissed

Notwithstanding the foregoing, plaintiff's allegations of defendants' conduct post-dating May 5, 2005 are timely and may be considered in connection with his First Amendment retaliation claim.  The Second Circuit has "described the elements of a First Amendment retaliation claim in several ways, depending on the factual context."  *Williams v. Town of Greenburgh*, 535 F.3d 71, 76 (2d Cir. 2008).  When the plaintiff is "a private citizen who sued a

public official," the Second Circuit has required the plaintiff "to show: '(1) he has an interest

protected by the First Amendment; (2) defendants' actions were motivated or substantially

caused by his exercise of that right; and (3) defendants' actions effectively chilled the exercise of

his First Amendment right.'" *Kuck v. Danaher*, 600 F.3d 159, 168 (2d Cir. 2010) (quoting

*Curley v. Vill. of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001)); *see also Williams*, 535 F.3d at 76

(applying the three-pronged test set forth in *Curley* in the case of plaintiff who "was not a public

employee when he criticized" a public official); *Butler v. City of Batavia*, 2009 WL 910194, at

*1 (2d Cir. Apr. 6, 2009) (applying the *Curley* test); *Connell v. Signoracci*, 153 F.3d 74, 79 (2d

Cir. 1998) (same).[11]

Here, even assuming that plaintiff has engaged in conduct protected by the First

Amendment by testifying before the Grand Jury in October 2002 and assisting his parents in

filing the IAU Complaint in October 2002, his claim must still fail because he has not established

a cognizable injury that can be remedied as part of a First Amendment retaliation claim.

Specifically, plaintiff has failed to demonstrate that any action taken by defendants "effectively

chilled the exercise of his First Amendment right." *Williams*, 535 F.3d at 76 (internal quotation

marks omitted). An essential element of a Section 1983 claim, including a claim of retaliation in

violation of the First Amendment, is that "some official action has caused the plaintiff to be

---

[11] Because defendants were not plaintiff's employer, the Court does not look to the "legal standard governing retaliation claims lodged by public employees" against their employers here. *See Williams*, 535 F.3d at 76. Consequently, plaintiff's speech "need not have been on a matter of public concern for it to fall within the protection of the First Amendment." *Id.* at 77. The Court notes that *Guida v. Police Department of the City of New York*, 1997 U.S. Dist. LEXIS 7053 (S.D.N.Y. May 20, 1997), upon which plaintiff heavily relies, pre-dates *Curley* and deals with the factual context of a public employee bringing a First Amendment retaliation claim against his employer. *See Guida*, 1997 U.S. Dist. LEXIS 7053 at *1.

deprived of his or her constitutional rights – in other words, there is an injury requirement to state the claim." *Id.* at 78 (quoting *Colombo v. O'Connell*, 310 F.3d 115, 117 (2d Cir. 2002)) (internal quotation marks omitted). The Second Circuit has "explained that plaintiffs who allege a violation of their right to free speech must prove that official conduct actually deprived them of that right." *Id.* (citing *Colombo*, 310 F.3d at 117). Therefore, to properly assert a First Amendment retaliation claim, a plaintiff must show that his First Amendment rights were 'actually chilled.'" *Balaber-Strauss v. Town/Vill. of Harrison*, 405 F. Supp. 2d 427, 433 (S.D.N.Y. 2005) (quoting *Curley*, 268 F.3d at 73) (internal quotation marks omitted).

Here, plaintiff has not demonstrated that any conduct on the part of defendants actually chilled the exercise of his First Amendment rights. In particular, plaintiff has not proffered any evidence of specific instances in which plaintiff "desired to exercise [his] First Amendment rights but was chilled by" the alleged conduct of defendants. *Mangano v. Cambariere*, 2007 WL 2846418, at *2 (S.D.N.Y. Sept. 27, 2007).

Moreover, plaintiff's arrest based upon the outstanding Bench Warrant is not a substitute for a showing of a chilling effect. *See Richardson v. N.Y. City Health & Hosps. Corp.*, 2009 WL 804096, at *20 n.8 (S.D.N.Y. Mar. 25, 2009). In *Richardson*, the plaintiff alleged that she was arrested for harassment and disorderly conduct in retaliation for her threat to report the arresting officer to his supervisor. *Id.* at *20. The court rejected the plaintiff's assertion that "she need not show a chilling effect on her speech because her arrest and the issuance of the summonses were a sufficient injury to maintain a First Amendment Claim." *Id.* at *20 n.8. The court explained:

> In a claim for retaliation under the First Amendment, a plaintiff must
> demonstrate a First Amendment harm. Where the retaliation claim
> is brought by a private citizen alleging that he or she was arrested in

retaliation for criticizing public officials, the relevant First Amendment harm is a chilling effect on the arrestee's speech. The absence of a chilling effect does not preclude other claims under [S]ection 1983 for, *inter alia*, excessive force, false arrest, or malicious prosecution, but it is fatal to this type of First Amendment claim.

*Id.* (internal citations omitted); *cf. Griffin-Nolan v. Providence Wash. Ins. Co.*, 2005 WL 1460424, at *9 (N.D.N.Y. June 20, 2005) (finding the plaintiff sufficiently alleged that his First Amendment rights were chilled when he alleged that after he engaged in First Amendment protected activity, he was threatened with arrest, and "Plaintiff stopped speaking to the officers").

Because plaintiff has failed to demonstrate an essential element of a First Amendment retaliation claim, the Court need not address the parties' arguments regarding causation. Accordingly, plaintiff's First Amendment retaliation claim is dismissed.

## III. *Plaintiff's Due Process Claims*

### A. *Plaintiff's Due Process Claim Based Upon Denial of his Purported Liberty Interest in his Reputation and Status is Dismissed*

Defendants seek dismissal of plaintiff's Fourteenth Amendment due process claims to the extent such claims are based on a constitutional violation of plaintiff's "liberty interest" in his reputation. Defendants assert that such a claim must be alleged as a "stigma plus" claim and that plaintiff has not shown a necessary element: that any defendant made "defamatory or stigmatizing statements [that] were public in nature and false." (Defs.' Mem. at 37.) Plaintiff contends in opposition that he has, in fact, established a "Due Process liberty interest claim" because he has put forth evidence of "government conduct that stigmatizes [ ] plaintiff coupled with a demonstration that [ ] he lost employment as a result of such conduct." (Pl.'s Opp'n at 27.)

It is axiomatic that a "person's interest in his or her good reputation alone, apart from a more tangible interest, is not a liberty or property interest sufficient to invoke the procedural protections of the Due Process Clause or create a cause of action under § 1983." *Patterson v. City of Utica*, 370 F.3d 322, 329-30 (2d Cir. 2004) (citing *Paul v. Davis*, 424 U.S. 693, 701 (1976)). Rather, a claim based solely upon a plaintiff's loss of reputation must be brought as a state law defamation claim, and cannot form the basis of a Section 1983 claim. *See Sadallah v. City of Utica*, 383 F.3d 34, 38 (2d Cir. 2004) ("Defamation . . . is an issue of state law, not of federal constitutional law, and therefore provides an insufficient basis to maintain a § 1983 action.")

"Loss of one's reputation can, however, invoke the protections of the Due Process Clause if that loss is coupled with the deprivation of a more tangible interest." *Patterson*, 370 F.3d at 330. Such claims are referred to as "stigma plus" claims. *Sadallah*, 383 F.3d at 38. To succeed on a stigma plus claim, "a plaintiff must show (1) the utterance of a statement sufficiently derogatory to injure his or her reputation, that is capable of being proved false, and that he or she claims is false, and (2) a material state-imposed burden or state-imposed alteration of the plaintiff's status or rights." *Id.* (internal quotation marks omitted).

Plaintiff's due process claim based upon defendants' alleged deprivation of his purported liberty interest in his "reputation" and "status" (*see* Compl. ¶ 120) must be dismissed because plaintiff has failed to establish the first element of a stigma plus claim. "The gravamen of 'stigma' as part of a due process violation is the making under color of law of a reputation-tarnishing statement that is *false*." *Doe v. Dep't of Pub. Safety ex rel. Lee*, 271 F.3d 38, 47-48 (2d Cir. 2001) (emphasis in the original). Here, plaintiff has not pointed to any record evidence

of statements made by the defendants that were "capable of being proved true or false," and this is fatal to any stigma plus claim. *See id.* at 48. For example, in his opposition papers, plaintiff emphasizes statements allegedly made during the June 14, 2007 and June 21-22, 2007 incidents. (*See* Pl.'s Opp'n at 29-30.) Specifically, plaintiff alleges that during the June 14, 2007 incident at Chrebet's, Tusa repeatedly asked to see plaintiff even after Chrebet had identified himself as the bar owner and stated: "Where is Matt Prince? I want to know where he is." (*Id.* at 29.) The Court cannot find any way that such a statement could be characterized as a false, reputation-tarnishing statement sufficient to support a stigma-plus claim.

Plaintiff also points to statements made by Soto when Soto arrested plaintiff pursuant to the open Bench Warrant. (*See id.* at 29-30.) The Court notes, as an initial matter, that plaintiff does not dispute that an open Bench Warrant existed at the time of his arrest. Instead, plaintiff alleges that, in front of bar patrons, Soto made the following statements during the arrest: "I'm going to be your new Sergeant Scalone," and "Isn't today my lucky day? I get to arrest you." (*See* Pl.'s Response to Defs.' 56.1 ¶ 100.) Soto denies making these statements. While these statements may be viewed as sarcastic or mean-spirited, the Court finds that they are also not the type of false, reputation-tarnishing statements sufficient to support a stigma-plus claim.

Finally, plaintiff asserts that during the June 27, 2007 meeting between Chrebet, Margiotta, Krummenacker, Antitomaso, and another individual who may or may not have been Lowrey, "the fire marshal made such statements as Prince is a cancer and that Chrebet's must get rid of him." (Pl.'s Opp'n at 30.) The evidentiary support for the assertion that Krummenacker referred to plaintiff as a "cancer" to the business comes from a document, dated January 23, 2008, entitled "Statement of Wayne Chrebet," which is signed by Wayne Chrebet but is unsworn.

(*See* Pl.'s Ex. 7.)  As set forth in the first paragraph of this "Statement," the document purports to be "a summary of what happened at Chrebet's in 2007 involving Matt Prince."  (*Id.* at ¶ 1.) Plaintiff has provided no information to the Court regarding the context in which the document was created or whether Chrebet prepared it alone or with assistance from anyone else.  In paragraph 13 of the "Statement," Chrebet states that during the January 23, 2008 meeting, "Mr. Krumenacker (sic) said that Matt is a detriment or 'cancer' to the business and my problems would be over if he was gotten rid of or no longer associated with the business."  (*Id.* at ¶ 13.)

As noted, the "Statement" is unsworn and the Court has no information as to the circumstances surrounding its creation.  During Chrebet's deposition, which took place on March 4, 2009, more than one year after the date of the "Statement," Chrebet repeatedly testified under oath that the "exact words" uttered by Krummenacker during the January 23, 2008 meeting were: "[I]f I didn't get rid of Matt Prince, that these were the kind of problems I was going to have." (Chrebet Dep. at 35-36.)  Chrebet did not repeat the assertion contained in his earlier-prepared "Statement" that Krummenacker referred to plaintiff as a "cancer" to Chrebet's business.  The Court chooses to credit Chrebet's sworn deposition testimony, and thus does not consider the assertion in Chrebet's unsworn "Statement" that Krummenacker stated that plaintiff was a "cancer" to the business.

Accordingly, defendants' motion is granted to the extent that plaintiff's stigma plus claim is dismissed.

### B.     *Plaintiff's Due Process Claim Based Upon Denial of Property Interests*

"In order to assert a violation of procedural due process rights, a plaintiff must 'first identify a property right, second show that the [government] has deprived him of that right, and

third show that the deprivation was effected without due process.'" *DeFabio v. E. Hampton Union Free Sch. Dist.*, 658 F. Supp. 2d 461, 487 (E.D.N.Y. 2009) (quoting *Local 342, Long Island Pub. Serv. Emps., UMD, ILA, AFL-CIO v. Town Bd. of Huntington*, 31 F.3d 1191, 1194 (2d Cir. 1994)) (alteration in the original).

Defendants argue that plaintiff cannot maintain a procedural due process claim based upon any alleged deprivation of plaintiff's employment at Chrebet's for two reasons: (1) Chrebet – a private actor – made the decision to terminate his business relationship with plaintiff and Chrebet's conduct did not occur under "color of law," and (2) because plaintiff was an "at-will" employee, he did not have a constitutionally-protected property interest in his employment. (Defs.' Mem. at 30-34.) In opposition, plaintiff points to evidence in the record that Chrebet "was forced to terminated Prince due to government pressure," and that defendants "engaged in a course of conduct designed to ensure that Prince never worked again at Chrebet's." (Pl.'s Opp'n at 25-26.) The Court addresses defendants' arguments in reverse order.

### 1.        Plaintiff had a Protected Property Interest in his Employment

The Court turns first to the question of whether plaintiff has identified a constitutionally protected property right. *See DeFabio*, 658 F. Supp. 2d at 487. Plaintiff asserts that he had a "valuable property interest" in both "his employment at Chrebet's" and "his business relationship with Wayne Chrebet." (Compl. ¶ 103.)[12] Defendants contend that plaintiff did not have a

---

[12]        In *San Jacinto Savings & Loan*, which plaintiff cites in his opposition papers, an arcade owner sued the municipality alleging that patronage at her arcade and her resultant income had declined as a result of unjustified police harassment of his customers. 928 F.2d at 699. The Fifth Circuit held that the plaintiff had a property interest in her business which was "essentially her interest in the lost profits, which are sought merely as the measure of damages in this action." *Id.* at 704; *see also Callaghan v. Congemi*, 1992 U.S. Dist. LEXIS 7961, at ** 8-9 (E.D.La. June 1, 1992) (relying on *San Jacinto Savings & Loan* in upholding due process claim brought by bar

constitutionally protected interest in his employment at Chrebet's because he was an at-will

employee. (Defs.' Mem. at 32-33.) According to plaintiff, however, the record evidence

demonstrates that he was not an at-will employee. (Pl.'s Opp'n at 27.) Specifically, plaintiff

asserts he and Chrebet entered into a Consulting Agreement that entitled him to a share in the

Corporation's profits, and that Chrebet could terminate their business relationship only by

entering into a separate agreement "to compensate [plaintiff] in exchange for voiding [their]

business agreement and severing [their] business relationship." (Defs.' 56.1 ¶ 16; *see also* Pl.'s

Opp'n at 27.)

　　"To have a property interest in a benefit, a person clearly must have more than an abstract

need or desire for it . . . He must, instead, have a legitimate claim of entitlement to it. . . ." *Bd.*

*of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). The Supreme Court has determined

that property interests "are not created by the Constitution." *Id.* "Rather, they are created and

their dimensions are defined by existing rules or understandings that stem from an independent

source such as state law . . . ." *Id.* The Second Circuit has also recognized that "'property'

protected by due process need not always flow from guaranty under state law or the

Constitution." *Stein v. Bd. of the City of N.Y., Bureau of Pupil Transp.*, 792 F.2d 13, 17 (2d Cir.

1986).

---

owner against municipality alleging that campaign of police harassment forced plaintiff out of
business). Decisions by and within the Second Circuit indicate, however, that "the loss of a
future business opportunity is not a protectible property interest." *Evac, LLC v. Pataki*, 89 F.
Supp. 2d 250, 258 (N.D.N.Y. 2000) (citing *Asbestec Const. Servs., Inc. v. U.S. Envtl. Prot.*
*Agency*, 849 F.2d 765, 770 (2d Cir. 1988) ("Mere opportunity to obtain a federal contract is not a
property right under the due process clause.")). In any event, it does not appear that plaintiff is
asserting that he had a constitutionally protected property interest in his share of the
Corporation's profits.

"Where the independent source of a property interest is a private contract, the state cannot transgress on the claim of entitlement to continued employment without due process of law." *Id.*; *accord Int'l Union, Sec., Police, & Fire Prof'ls of Am. (SPFPA) v. U.S. Marshal's Serv.*, 350 F. Supp. 2d 522, 534 (S.D.N.Y. 2004) ("A collective bargaining agreement between a union and a private employer is a term of employment for the purposes of due process analysis even though the government entity is not a party to that contract."). Here, plaintiff asserts that the source of his property interest in his employment at Chrebet's is the Consulting Agreement. The Consulting Agreement provides that plaintiff will serve the Corporation as a consultant and that the terms of the agreement "shall remain in full force and effect for such period of time until MATTHEW becomes a shareholder in the Corporation or until such time as MATTHEW shall voluntarily withdraw from this Consulting Agreement." (Ben-Sorek Decl., Ex. G ¶ 2.) Given these facts, the Court cannot conclude as a matter of law that plaintiff was an "at will" employee of Chrebet's without any "legitimate claim of entitlement" to continued employment as a consultant of the Corporation.

Defendants assert that the circumstances surrounding the severing of the business relationship between plaintiff and Chrebet amount to nothing more than a "breach [of] contract," and contends that he cannot recover damages for a breach of contract through the vehicle of a Section 1983 action. (Defs.' Mem. at 33.) Defendants are correct that "a contract dispute does not give rise to a cause of action under section 1983." *Courtemanche v. Enlarged City Sch. Dist. of City of Middletown, N.Y.*, 686 F. Supp. 1025, 1028 (S.D.N.Y. 1988). The Court does not agree, however, that plaintiff's claims sound in breach of contract. Rather, plaintiff asserts that he was deprived of a property interest that is grounded in the Consulting Agreement without due

44

process of law.  *See id.*

## 2.    Questions of Fact Exist as to Whether Plaintiff was Deprived of his Protected Property Right

Plaintiff argues that defendants' conduct directly caused Chrebet to terminate plaintiff's employment.  (Pl.'s Opp'n at 22.)  As defendants correctly point out, "private actors are not liable under section 1983 unless 'the conduct allegedly causing the deprivation of a federal right [can] be fairly attributable to the State.'"  *Omnipoint Commc'ns Inc. v. Comi*, 233 F. Supp. 2d 388, 393 (N.D.N.Y. 2002) (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982)); *see also* Defs.' Mem. at 30 (contending that the Court should employ the "close nexus" test to determine whether defendants can be responsible for Chrebet's conduct).[13]  Here, however, plaintiff is not attempting to hold Chrebet, a private actor, liable for a violation of his constitutional rights.  Rather, plaintiff contends that defendants engaged in conduct that caused Chrebet to terminate his employment, and that defendants' conduct violated his constitutional rights.

It is well-established that a successful Section 1983 claimant must prove "that the defendant caused the deprivation of his or her rights."  *Taylor v. Brentwood Union Free Sch. Dist.*, 143 F.3d 679, 686 (2d Cir. 1998) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 692 (1978)).  "The Supreme Court consistently refused to impose § 1983 liability upon defendants where the causal connection between their conduct and the constitutional injury is remote rather than direct."  *Id.* (citing *Martinez v. California*, 444 U.S. 277, 285 (1980) ("[N]ot every injury in

---

[13]    *See Turturro v. Cont'l Airlines*, 334 F. Supp. 2d 383, 394 (S.D.N.Y. 2004) (noting that the "close nexus" test can be used to determine whether private conduct represents state action for the purposes of Section 1983 liability).

which a state official has played some part is actionable under [Section 1983.]")).  In this vein, the Second Circuit has applied "elementary principles of causation" in determining whether a sufficient causal link connects the alleged conduct and injury.  Thus, no liability under Section 1983 will attach when a "superseding cause [breaks] the causal chain between" a defendant's alleged conduct and plaintiff's asserted constitutional injury. *Jeffries v. Harleston*, 52 F.3d 9, 14 (2d Cir. 1995); *see also Taylor*, 143 F.3d at 687 (finding no Section 1983 liability when actions of non-defendants "constitute a superseding cause of [plaintiff's] injury, breaking the causal link between any racial animus [defendant] may have had and [plaintiff's] suspension").  On the other hand, however, "a defendant may be held liable for 'those consequences attributable to reasonably foreseeable intervening forces, including the acts of third parties.'" *Taylor*, 143 F.3d 688 (quoting *Warner v. Orange Cnty. Dep't of Prob.*, 115 F.3d 1068, 1071 (2d Cir. 1997)); *Ross v. Lichtenfeld*, 755 F. Supp. 2d 467, 476 (S.D.N.Y. 2010) ("[T]he intervening actions of the Board . . . were foreseeable consequences of [defendant's] actions, so he can be held liable for the ultimate result.").

Here, plaintiff has proffered evidence that on June 27, 2007, Chrebet met with Fire Marshal Krummenacker as well as a "high ranking police officer, Chief Kevin Lowrey."  (*See* Pl.'s 56.1 ¶ 314.)  Plaintiff has also put forth evidence that, during that meeting, Krummenacker told Chrebet that if he did not sever his relationship with plaintiff, he and his business would suffer unwelcome consequences in the form of continued frequent visits from the Police Department and Fire Marshal.  Plaintiff has also pointed to evidence that Lowrey echoed Krummenacker's sentiments and encouraged Chrebet to terminate plaintiff's employment.  Finally, plaintiff has proffered evidence that, as a result of the comments made during this

meeting and against his will, Chrebet agreed to terminate plaintiff's employment.[14]  If a jury

believed these assertions, they could conclude that defendants' conduct directly caused Chrebet

to terminate plaintiff's employment.  Defendants vigorously deny plaintiff's description of the

statements made during the June 27, 2007 meeting, and further denies that Krummenacker,

whom they contend was present at the meeting only in his personal capacity, ever told Chrebet to

change managers or fire plaintiff.  Thus, a question of fact exists.

## IV.    *The Liability of the Individual Defendants Under Section 1983*

Plaintiff does not specify whether the individual defendants are being sued in their

official or individual capacities.  To the extent plaintiff has named the individual defendants in

the official capacities, those claims are "essentially a suit against the government entity itself,"

and should be resolved in tandem with the *Monell* claim against the County.  *See Vassallo v.*

*Lando*, 591 F. Supp. 2d 172, 202 n.24 (E.D.N.Y. 2008) ("Likewise, with regard to the individual

defendants, to the extent they are being sued in their official capacities, the claims against them

are duplicative of the *Monell* claim against the District."); *Obilo v. City Univ. of City of N.Y.*,

2003 WL 1809471, at *12 (E.D.N.Y. Apr. 7, 2003) ("Accordingly, plaintiff's claim against

Burgess in his official capacity is basically a claim against the City of New York.").

To the extent plaintiff has sued the individual defendants in their individual capacities,

"[i]t is well-settled in [the Second Circuit] that personal involvement of defendants in alleged

constitutional deprivations is a prerequisite to an award of damages under § 1983."  *Middleton v.*

---

[14]      The Court declines defendants' request that it "disregard" Chrebet's affidavit as
"self-serving and designed to create an issue of fact where none exists," as this assertion appears
based solely on the fact that Chrebet "currently has his own complaint pending before this
Court."  (Reply Mem. at 8.)

*City of New York*, 2006 WL 1720400, at *13 (E.D.N.Y. June 19, 2006) (quoting *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)) (internal quotation marks omitted, alteration in the original). Thus, in order for any of the individual defendants to be liable in their individual capacities for the alleged due process violation, the only remaining Section 1983 claim, plaintiff must proffer sufficient evidence of their personal involvement in the violation.

The Court has already determined that a question of fact exists as to whether the statements made during the June 27, 2007 meeting with Chrebet, Krummenacker, and (to the extent he was present) Lowrey directly caused Chrebet to terminate plaintiff's employment. Krummenacker and Lowrey, however, are not named as defendants in this action. Moreover, plaintiff has not asserted that any of the individually-named defendants were present during the June 27, 2007 meeting. Plaintiff does contend that defendants Fitzgerald and Rothenberg were present at the March 17, 2008 meeting, which was initiated by Chrebet, Sr. and held at the First Precinct. It is undisputed, however, that plaintiff's employment as a consultant for the Corporation had already been terminated approximately eight months prior to the March 17, 2008 meeting. Thus, the statements attributed to Fitzgerald and Rothenberg during the March 17, 2008 meeting could not possibly have caused Chrebet to terminate plaintiff's employment.

While Soto and Tusa are not alleged to have been present during the June 27, 2007 meeting, plaintiff asserts that they participated in the campaign of harassment that targeted plaintiff. Specifically, both Tusa and Soto were involved in the June 14, 2007 incident, and Soto was also involved in the June 22, 2007 incident, including plaintiff's arrest. The Court finds that, with respect to Tusa and Soto, plaintiff has proffered sufficient evidence as to their personal involvement in the remaining Section 1983 claim to warrant the case against them to proceed to

48

the jury. Although the June 27, 2007 meeting is alleged to be the final straw that caused Chrebet to, reluctantly, terminate plaintiff's employment, it is clear that the alleged campaign of harassment perpetrated, in part, by Tusa and Soto, was part and parcel in that decision. Specifically, plaintiff has proffered evidence that the harassment alleged to have been committed by Tusa and Soto was ultimately held over Chrebet's head as a threat: either terminate plaintiff's employment or continue to experience this same type of harassment by the Police Department and Fire Marshal.

By contrast, the only alleged conduct attributed to Hermann commenced in November 2007 – four months after plaintiff's employment was terminated – and therefore could not have caused Chrebet to terminate plaintiff's employment. Accordingly, plaintiff has failed to establish Hermann's personal involvement in the remaining Section 1983 claim, and defendants' motion for summary judgment is granted as to him.

Accordingly, plaintiff's due process claims against Fitzgerald, Hermann, and Rothenberg in their individual capacities are dismissed. Defendants' motion for summary judgment is denied, however, as to plaintiff's claims against Soto and Tusa in their individual capacities.

## V.   *Municipal Liability Under Section 1983*

A municipality may not be held liable under Section 1983 on a *respondeat superior* theory of liability for its employees' alleged constitutional violations. *See Monell v. N.Y. City Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978); *Zahra v. Town of Southold*, 48 F.3d 674, 685 (2d Cir. 1995). A municipal entity may only be liable if the alleged conduct was undertaken pursuant to "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by [its] officers" or a "governmental 'custom' even though such a custom has not received formal

approval through [ ] official decisionmaking channels." *Monell*, 436 U.S. at 690-91. Therefore,

> a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.

*Id.* at 694 (quoted by *Coon v. Town of Springfield, Vt.*, 404 F.3d 683, 686 (2d Cir. 2005)).

The existence of a municipal policy or custom may be established in any of four ways. A plaintiff may demonstrate that his constitutional injuries arose from: "(1) the existence of a formal policy officially endorsed by the municipality; (2) actions taken or decisions made by municipal officials with final decision making authority, which caused the alleged violation of plaintiff's civil rights; (3) a practice so persistent and widespread that it constitutes a custom of which constructive knowledge can be implied on the part of the policymaking officials; or (4) a failure by policymakers to properly train or supervise their subordinates, amounting to 'deliberate indifference' to the rights of those who come in contact with the municipal employees." *Williams v. City of Mt. Vernon*, 428 F. Supp. 2d 146, 159 (S.D.N.Y. 2006) (citing *Moray v. City of Yonkers*, 924 F. Supp. 8, 12 (S.D.N.Y. 1996)); *see also Bonds v. Suffolk Cnty. Sheriff's Dep't*, 2006 WL 3681206, at *2 (E.D.N.Y. Dec. 5, 2006) (same); *Peterson v. Tomaselli*, 2004 WL 2211651, at *9 (S.D.N.Y. Sept. 30, 2004) (same).

Plaintiff bases his municipal liability claim on three theories. First, he contends that the County "failed to properly train its Internal Affairs investigators, thus allowing the harassment of Prince to continue unabated." (Pl.'s Opp'n at 40.) As support for this contention, plaintiff points to record evidence that Hoffman did not begin to work on plaintiff's parents' complaint "until

eight months after the complaint was submitted," and that the entire investigative process took approximately two years to complete. (*Id.*) Moreover, according to plaintiff, "Hoffman did everything in his power to find the complaint unfounded," including refraining from interviewing all but one of plaintiff's witnesses and refusing to interview plaintiff or his parents, discounting the witness affidavits submitted by Bogart's employees and patrons, and interviewing only three "selectively-chosen" neighbors of Bogart's who "had negative comments" about the bar. (*Id.* at 40-41.) Plaintiff also emphasizes that Soto and Hermann both testified "that to the best of their knowledge no civilian complaint against a Nassau County Police Officer has ever been determined to be founded, well placed or sustained." (*Id.* at 41.)

Plaintiff's parents' IAU complaint was initiated in October 2002, and Hoffman's investigation concluded with his report, which was issued on January 11, 2005. For the reasons set forth in *supra*, these allegations are time-barred. Moreover, the remaining anecdotal evidence proffered by plaintiff, to wit, the testimony of two Sergeants working in the same precinct of the Police Department that "to the best of their knowledge no civilian complaint against a Nassau County Police Officer has ever been determined to be founded, well placed or sustained" (Pl.'s Opp'n at 41) is simply not enough to create a question of fact for the jury, particularly when plaintiff has made no independent effort to substantiate such testimony with any independent, objective, or statistical evidence.[15]

_____

[15]     In *Sorlucco v. N.Y. City Police Dep't*, 971 F.2d 864, 873 (2d Cir. 1992), a case cited to by plaintiff in his opposition papers (Pl.'s Opp'n at 40), the Second Circuit "note[d] in passing [of] a possibility" that the plaintiff's claim for municipal liability based upon "the NYPD's failure to train or supervise its internal affairs officers" might "prevail under the circumstances presented" in that case. The Court does not find this citation persuasive; the facts of *Sorlucco* are entirely distinguishable from the facts of this case and, in any event, the Second Circuit did not actually address the sufficiency of the plaintiff's *Monell* claim on that ground

51

Plaintiff's second theory of municipal liability stems from "evidence that the Nassau County police officers and fire marshals engaged in a widespread practice of harassing bars." (*Id.* at 42.)  As defendants point out, however, plaintiff has proffered evidence only as to purported harassment that occurred with respect to Bogart's and Chrebet's – not with any other bars or restaurants within the relevant area.  (*See* Reply Mem. at 9.)  To be sure, plaintiff's own testimony demonstrates his theory of the case is that defendants' alleged harassment was personal and directed purposefully and solely towards plaintiff.  (*See, e.g.* Pl.'s Dep. at 98 ("[I]t was personal.  That's the difference.").)  The Court declines to find that the alleged harassment – even if undertaken by municipal employees as part of a nefarious plot of revenge – is sufficient to establish *Monell* liability.  *Compare McLaurin v. New Rochelle Police Officers*, 373 F. Supp. 2d 385, 401 (S.D.N.Y. 2005) ("[O]ne man's experience does not make a policy."), *aff'd in part, vacated on other grounds*, 2007 WL 247728 (2d Cir. Jan. 25, 2007), *and Birmingham v. Ogden*, 70 F. Supp. 2d 353, 373 (S.D.N.Y. 1999) (dismissing municipal liability claims when "the only fair inference here is that what happened to plaintiff . . . was unique to him – a deeply personal vendetta carried out by persons who were out to get him), *with Sorlucco*, 971 F.2d at 871-73 (upholding municipal liability claim based on theory that "NYPD engaged in a pattern of disciplining *probationary officers*, who had been arrested while on probation, in a discriminatory and disparate manner based upon their gender") (emphasis added).

Plaintiff also alleges that "Nassau County failed to properly train [police officers and fire marshals] in the laws applicable to inspections."  (Pl.'s Opp'n at 42.)  As support for this assertion, plaintiff juxtapositions Krummenacker's testimony that tickets could properly be

───────────────────────

because it had been apparently abandoned on appeal.

issued to a bar manager with Hermann's testimony that tickets can only be issued to a bar owner. (*See id.*)[16]  The Supreme Court has made clear that "inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."  *City of Canton v. Harris*, 489 U.S. 378, 388 (1989).  The deposition testimony cited by plaintiff represents simply a quibble as to the correct procedure for issuing tickets, and does not amount to "deliberate indifference" to the constitutional rights of citizens.

Finally, plaintiff asserts that municipal liability is appropriate here because "the evidence demonstrates that Nassau County Executive Thomas Suozzi was well-aware of Chrebet's complaints."  (Pl.'s Opp'n at 42.)  Plaintiff asserts that Suozzi's statements during his meeting with Chrebet and Margiotta create questions of fact "as to whether Nassau County 'ratified' Defendants['] improper behavior."  (*Id.*)  Plaintiff contends that during this meeting, "amongst unrelated issues, Mr. Margiotta mentioned that the 'problem at [Chrebet's] restaurant' had been taken care of, (referring to the termination of Matthew Prince), and Mr. Suozzi replied, 'I am aware of that.'" (Chrebet Aff. ¶ 6.)

The Supreme Court has set forth that "an unconstitutional governmental policy [can] be inferred from a single decision taken by the highest officials responsible for setting policy in that area of the government's business."  *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988); *accord Gronowski v. Spencer*, 424 F.3d 285, 296 (2d Cir. 2005) ("Even one episode of illegal

---

[16]     Plaintiff also claims that Soto issued Chrebet's a ticket for failing to properly display its licenses on June 14, 2007, but that Hermann found the licenses were properly displayed in November 2007.  (*See* Pl.'s Opp'n at 41.)  These facts do not support a claim for municipal liability.  (*See also* footnote 9, *supra*.)

retaliation may establish municipal liability under § 1983 if ordered by a person whose edicts or acts represent official city policy.") Here, however, the undisputed statements attributed to Suozzi are simply insufficient to create a question of fact as to whether Suozzi knew that Chrebet terminated plaintiff's employment as a direct result of the statements made during the June 27, 2007 meeting, which suggested that the alleged ongoing campaign of harassment by the police and fire marshals would continue unless plaintiff was terminated. At most, the cited colloquy suggests that Suozzi knew that plaintiff no longer worked at Chrebet's. This is simply too thin a reed upon which to base a claim that Suozzi was aware of, much less complicit in, any wrongdoing by the Police Department and Fire Marshal.

The Court does find, however, that the evidence surrounding the June 27, 2007 meeting creates a question of fact on the issue of municipal liability. As noted above, the Court has determined that questions of fact exist as to (1) whether, and to what extent, Lowrey was involved in the June 27, 2007 meeting, and (2) whether statements made by Krummenacker and Lowrey (to the extent he was present) during that meeting caused Chrebet to sever his business relationship with plaintiff. There is evidence in the record suggesting that Krummenacker and Lowrey were relatively senior or high-ranking officers of the Fire Marshal and Police Department, respectively. (*See* Pl.'s 56.1 ¶ 314.) For municipal liability to attach based upon their actions, however, they "must be responsible under state law for making policy in that area of the municipality's business." *Jeffes v. Barnes*, 208 F.3d 49, 57 (2d Cir. 2000) (internal citations, alterations and quotation marks omitted). "Thus, the court must ask whether the government official is a final policymaker for the local government in a particular areas, or on the particular issue involved in the action." *Id.* "[W]here a municipal official has final authority

over significant matters involving the exercise of discretion, his choices represent government policy." *Frisenda v. Inc. Vill. of Malverne*, 2011 WL 1227774, at *26 (E.D.N.Y. Mar. 31, 2011) (quoting *Gronowski*, 424 F.3d at 296) (internal quotation marks omitted).

Here, the Court finds that, in addition to the fact questions set forth above, there is a question for the jury as to the exact nature of the positions held by Krummenacker and Lowrey, the capacity in which Krummenacker attended the meeting, and whether they are final policymakers with respect to decisions regarding the manner in which the Police Department and Fire Marshal's employees conduct themselves, particularly with respect to their interactions with citizens and local businesses. Accordingly, defendants' motion for summary judgment on the County's liability is denied.

## VI.   *Plaintiff's Tortious Interference With Business Relations Claim*

Under New York law, in order for plaintiff to maintain his claim for tortious interference with business relations (*see* Compl. ¶¶ 177-84) he must demonstrate: "(1) business relations with a third party; (2) the defendant's interference with those business relations, (3) the defendant acted with the sole purpose of harming the plaintiff or used dishonest, unfair, or improper means; and (4) injury to the business relationship." *Nadel v. Play-By-Play Toys & Novelties, Inc.*, 208 F.3d 368, 382 (2d Cir. 2000). Defendants claim that plaintiff has brought this cause of action "despite the existence of a valid contract with Chrebet" (*see* Defs.' Mem. at 40), but cite no case law to support the proposition that the existence of a contract precludes a plaintiff from asserting a claim for tortious interference with business relations.

Here, as noted above, there exist questions of fact regarding exactly what was said during the June 27, 2007 meeting between Chrebet, Margiotta, Krummenacker and Lowrey, and

whether Chrebet actually terminated plaintiff's employment as a direct result of those alleged statements. If plaintiff's version of the facts is believed, the jury could find that this tort was committed and that the County is vicariously liable for the conduct of its employees during that meeting. *See Pizzuto v. Cnty. of Nassau*, 239 F. Supp. 2d 301, 313-14 (E.D.N.Y. 2003). Accordingly, defendants' motion for summary judgment as to plaintiff's tortious interference with business relations claim is denied.

## VII.   *Plaintiff's Intentional Infliction of Emotional Distress Claim*

In order to assert a claim for intentional infliction of emotional distress under New York law, a plaintiff must show: "(1) extreme and outrageous conduct, measured by the reasonable bounds of decency tolerated by society; (2) intent to cause or disregard of a substantial probability of causing severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress." *Margrabe v. Sexter & Warmflash, P.C.*, 353 Fed. Appx. 547, 550 (2d Cir. 2009) (quoting *Conboy v. AT&T Corp.*, 241 F.3d 242, 258 (2d Cir. 2001)) (internal quotation marks omitted). "The conduct at issue must transcend the bounds of decency and be regarded as atrocious and utterly intolerable in a civilized community." *Id.* (internal quotation marks omitted). Generally, "courts are reluctant to allow recovery under the banner of intentional infliction of emotional distress absent a deliberate and malicious campaign of harassment or intimidation." *Id.* (internal quotation marks and alteration omitted).

Defendants contend that plaintiff's claim for intentional infliction of emotional distress should be dismissed because plaintiff's proffered evidence "fails to raise a triable issue as to whether the Defendants' conduct was sufficiently extreme or outrageous to support his claim." (Defs.' Mem. at 42.) As an initial matter, the Court notes that the statute of limitations in New

56

York for a claim of intentional infliction of emotional distress is one year from the date of the infliction. *See Fertig v. HRA Med. Assistance Program*, 2011 WL 1795235, at *6 (E.D.N.Y. May 6, 2011). Thus, plaintiff's intentional infliction of emotional distress claim will be considered only to the extent it is supported by evidence of conduct occurring on or after May 5, 2007, i.e., one year prior to the filing of the Complaint. *See Allen v. Mattingly*, 2011 WL 1261103, at *12 (E.D.N.Y. Mar. 29, 2011). Such alleged conduct would include the June 14 and 22, 2007 incidents, plaintiff's arrest on June 22, 2007 – including Soto's alleged comments to plaintiff during the confrontation in his jail cell – and Chrebet, Sr.'s March 19, 2008 letter to plaintiff, which allegedly was sent only at the express direction of Fitzgerald. The Court finds that a sufficient question of fact exists for the jury to determine whether the alleged conduct occurred and whether it was sufficiently extreme or outrageous to permit plaintiff to recover under this theory.

## VIII. *Plaintiff's New York State Constitution Claims are Dismissed*

Finally, defendants move to dismiss plaintiff's claims asserted under the Constitution of the State of New York. Plaintiff brings claims under the New York State Constitution based upon "First Amendment Retaliation," Article I, § 8 (Compl. ¶¶ 91-101), and due process, Article 1, § 6 (*id.* ¶¶ 110-118, 129-39).

Plaintiff's claim under the New York State Constitution Article I, § 8 is dismissed for the same reasons as plaintiff's First Amendment retaliation claim described above – namely, plaintiff has failed to adequately plead such a claim. *See Williams*, 428 F. Supp. 2d at 160 (dismissing Section 1983 claim and corresponding claim under the New York State Constitution). Moreover, to the extent plaintiff's Fourteenth Amendment procedural due process claim described above

57

has been dismissed, his corresponding Article I, § 6 claim is also dismissed for the same reason. *Coakley v. Jaffe*, 49 F. Supp. 2d 615, 628 (S.D.N.Y. 1999) ("[T]he conclusion . . . that the plaintiffs' federal . . . due process rights were not violated dictates the conclusion that the plaintiffs' parallel rights under the state constitution were also not infringed.").  Finally, to the extent the Court has denied summary judgment as to plaintiff's due process claim, his Article I, § 6 claim is dismissed because the New York State Constitution "is unavailable where an alternative remedy will adequately protect the interests at stake."  *Id.* at 628-29.

## *CONCLUSION*

For the reasons set forth above, defendants' motion for summary judgment is granted in part and denied in part, as follows: (1) plaintiff's claim under Section 1983 for First Amendment retaliation is dismissed in its entirety; (2) plaintiff's claim under Section 1983 based upon a Fourteenth Amendment due process violation is dismissed as to Fitzgerald, Hermann, and Rothenberg in their individual capacities; and (3) plaintiff's claims under the New York State Constitution are dismissed in their entirety.

Defendants' motion is denied as to: (1) plaintiff's claim under Section 1983 based upon a Fourteenth Amendment due process violation as to Soto and Tusa in their individual capacities, as well as the County, and (2) plaintiff's state law claims for tortious interference with business relations and intentional infliction of emotional distress.


**SO ORDERED.**

Dated:   Central Islip, New York
             September 21, 2011

/s/_____
Denis R. Hurley
United States District Judge
